IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>DOROTHY BROWN, in her official capacity as Clerk of the Circuit Court of Cook County, Illinois,<br><br>Defendant. | Case No: 17-cv-7933 |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Courthouse News Service ("CNS"), by and through its undersigned attorneys, alleges the following in support of its Complaint for Injunctive and Declaratory Relief against Defendant Dorothy Brown, in her official capacity as Clerk of the Circuit Court of Cook County, Illinois (the "Clerk"):

**INTRODUCTION**

1. The First Amendment provides the press and public with a presumptive right of access to civil complaints filed with the court. Grounded in the right of free expression, where the right of access applies, such access must also be contemporaneous. Contemporaneous access to new civil complaints is fundamental to the public's ability to discuss what is happening in an important branch of government, and is essential to accurate and fair news reporting of civil disputes.

2. Courts across the country have recognized that the presumption of access attaches to judicial documents, including civil complaints, upon receipt of those documents by a court, and that delays in access are the functional equivalent of access denials. When a complaint is

10875130

withheld, it "leaves the public unaware that a claim has been leveled and that state power has been invoked – and public resources spent – in an effort to resolve the dispute." *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016). *See also Levenstein v. Salafasky*, 164 F.3d 345, 348 (7th Cir. 1998) ("in all but the most extraordinary cases . . . complaints must be public.").

3. But in the Circuit Court of Cook County, Illinois (the "Circuit Court"), new electronically filed, or "e-filed," civil complaints are not made available to the press or public in a timely and contemporaneous manner. In recent months, nearly 40% – roughly two out of every five complaints, on average – were withheld from the press for a day or more, with delays stretching up to ten and eleven days, and even 28 in one instance.

4. These delays in access to newly e-filed civil complaints at the Circuit Court – where e-filing is currently voluntary but is scheduled to become mandatory on January 1, 2018 – is the result of the Clerk's policy and practice of withholding new e-filed complaints from press review until after the performance of administrative processing, including post-filing "acceptance" of the complaint, at which time the Clerk deems the complaint "officially filed." The Clerk takes this position even though the applicable rules and orders provide that e-filed complaints received before midnight on a court day are "deemed filed" on the date of receipt, even if they are not "officially" accepted as filed until a later date, and even though paper-filed complaints in the Circuit Court have been and continue to be made available for press review in a contemporaneous manner almost entirely on the same day of receipt.

5. By contrast, new civil complaints filed in the United States District Court for the Northern District of Illinois, where electronic filing of civil cases is mandatory, automatically flow onto the Public Access to Court Electronic Records ("PACER") website, where they are

2

available to the public and press immediately upon filing, even after the court is closed for the day, without administrative processing by court personnel. This practice continues the pre-processing access that existed while e-filing was still permissive, and long before that when complaints were filed in paper form. The two other federal district courts in Illinois also make newly e-filed complaints available to the public and press upon filing and before administrative processing, as do the vast majority of federal district courts across the nation.

6. The same is true for a growing number of state courts that have transitioned to e-filing, including state courts in New York, Georgia, Nevada, Alabama, Connecticut, and Utah. This access to new e-filed complaints upon receipt and before administrative processing carries on the tradition of contemporaneous access to complaints filed in paper form, which journalists traditionally reviewed on intake and before docketing or processing as part of their regular courthouse coverage, including at the Circuit Court.

7. By denying CNS and the public contemporaneous access to newly e-filed civil complaints, Defendant effectively temporarily seals them, in violation of the rights secured to CNS and the public by the First and Fourteenth Amendments to the U.S. Constitution. Having failed in its efforts to work cooperatively with Defendant to reach an amicable resolution to these delays, CNS brings this action challenging the legality of the Clerk's actions and seeking injunctive and declaratory relief.

## JURISDICTION AND VENUE

8. CNS's claims arise under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act, Title 42 U.S.C. § 1983, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory relief). Defendant is subject to personal jurisdiction in this District.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's primary place of business is in this District, and because a substantial part of the events or omissions giving rise to CNS's claims occurred in this District.

## PARTIES

10. CNS is a California corporation with its principal place of business located in Pasadena, California. A widely-read legal news service with thousands of subscribers across the nation, CNS specializes in news reporting about civil litigation, from the date of filing through the appellate level in state and federal courts throughout the United States. CNS's comprehensive and timely coverage of civil litigation through its print, website, and e-mail publications has made it a go-to source of information about the nation's civil courts.

11. Defendant Dorothy Brown is the Clerk of the Circuit Court of Cook County, and is sued in her official capacity only. The Clerk is responsible for, among other things, ensuring that all records, dockets, and other papers related to the proceedings and determinations of the Circuit Court are maintained and made available to the public for inspection and examination.

12. Acting in her official capacity, Defendant, as well as those acting at her direction and under her supervision, is directly involved with and/or responsible for acts giving rise to the delays in access to newly e-filed complaints experienced by CNS. These acts reflect the official practice and policy of the Clerk's Office. The Clerk's actions and inactions, as alleged in this Complaint, are under the color of Illinois law and constitute state action within the meaning of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

13. CNS seeks relief against Defendant, as well as against her agents, assistants, successors, employees, and all persons acting in concert or cooperation with her or at her direction or under her control.

## FACTUAL ALLEGATIONS

### CNS's Publications and Subscribers

14. CNS is a nationwide news service founded almost 30 years ago out of a belief that great swaths of news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts. CNS now employs approximately 240 people, most of them editors and reporters, covering approximately 2,600 state and federal trial and appellate courts in all 50 states in the United States. CNS currently employs seven reporters who cover the state and federal trial and appellate courts of Illinois.

15. CNS offers a variety of publications. One category is its "New Litigation Reports," which contain original, staff-written summaries of significant new civil complaints. CNS's New Litigation Report covering the Circuit Court is called the *Cook County Report*. The *Cook County Report* covers complaints filed in the Law and Chancery Divisions of the Circuit Court, and typically focuses on civil complaints filed against business institutions, public entities, prominent individuals, or other civil actions of interest to CNS's subscribers. It does not, however, cover criminal, domestic relations, or probate matters.

16. Among CNS's other publications are its two print newsletters and an electronic "Daily Brief," which covers published, nationwide appellate rulings, including all U.S. Supreme Court and federal circuit decisions, as well as significant rulings from a growing number of federal district courts, including the three in Illinois.

17. In addition, CNS publishes a freely-available website, www.courthousenews.com, featuring news reports and commentary, which is read by hundreds of thousands of people each month. The website functions much like a print daily newspaper, featuring staff-written articles

from throughout the nation that are posted throughout each day, and rotated on and off the page on a 24-hour news cycle.

18. CNS has been credited as the original source of reporting on various topics by a wide range of publications, including the *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, The Daily Beast, *The Christian Science Monitor*, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, NBC News, *New York Daily News, New York Magazine*, *The New York Times*, National Public Radio or NPR, *The Orange County Register*, Politico, *The Telegraph* (UK), *Rolling Stone*, *San Antonio Express-News*, Slate, *Salt Lake City Tribune, The Washington Times*, *Women's Health Policy Report*, *U.S. News and World Report*, *USA Today*, *The Wall Street Journal*, *The Washington Post*, United Press International or UPI, the YouTube news channel, and others. In addition, U.S., Canadian, and New Zealand radio shows have interviewed CNS reporters.

19. To prepare the New Litigation Reports and identify new cases that may warrant a website article, CNS reporters have traditionally visited their assigned courts on a daily basis to review all the complaints filed that day to determine which ones are newsworthy. Given the nature of the New Litigation Reports and CNS's other news publications, any delay in the ability of a reporter to review newly filed complaints necessarily creates a delay in CNS's ability to inform subscribers and the public of the factual and legal allegations in those complaints.

20. CNS has more than 2,000 subscribers nationwide. A substantial set of news and entertainment outlets are CNS subscribers, including but not limited to *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox

10875130

Entertainment Group, *Houston Chronicle*, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal, The Wall Street Journal*, Warner Bros., and many TV stations, as well as the Washington, D.C.-based Center for Public Integrity.

21. Among academic institutions, subscribers to CNS's New Litigation Reports include Boston College Law School, Boston University, Case Western Reserve University, Harvard Law School, Loyola Law School, MIT Sloan School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law.

22. All but a very few of the nation's large and mid-sized law firms also subscribe to one or more of CNS's publications, a significant number of which have offices in Chicago, Illinois. Non-law firm business entities, including large publicly-traded companies, government entities, and non-profits, also subscribe to CNS's publications.

**There Is A Long Tradition Of, And Value In, Access To Complaints On Receipt For Filing**

23. A new complaint serves as the opening bell in a legal contest, and in recognition of the media's crucial role in informing interested persons about new court cases, it has been a long-standing tradition for courts to provide reporters with access to new civil complaints upon receipt for filing, whether or not the administrative tasks associated with the intake of that complaint have been completed. This ensures that interested members of the public learn about new cases in a timely manner, while those cases are still newsworthy. At the Circuit Court, before e-filing, there was a decades-long tradition of making complaints available to the press in a timely manner, upon receipt and before the completion of administrative tasks associated with the intake of the new complaint – what was referred to in the paper world as "docketing" and in

7

the e-filing environment is often called "processing." This, in turn, allowed journalists an opportunity to review and report on the complaints the same day they were filed.

24. Since at least 1997, and continuing today, reporters have had contemporaneous access to new paper-filed civil complaints at the Circuit Court as soon as they crossed the Clerk's intake counter, regardless of whether the Clerk's staff had completed administrative processing. This was (and is) the practice at many other state and federal courts across the nation. Attached hereto as **Exhibit A** is a true and correct copy of that certain Declaration of William Girdner (without exhibits), dated March 8, 2016, and filed on March 14, 2016, in the Central District of California in *Courthouse News Serv. v. Planet*, Case No. 11-cv-08083, Dkt. 124. Through his declaration, Mr. Girdner, CNS's editor and publisher, describes the aforementioned access.

25. There is good reason for this practice. The complaint forms the foundation of litigation. It is the document by which the authority of a branch of government is invoked to resolve what had previously been a private dispute. When a complaint is received by a clerk for filing, the public – which funds the operation of the courts – is entitled to know who has invoked the jurisdiction and authority of the judicial branch and to what end. The identity of the parties, the subject matter, the factual and legal nature of the claims, and the day of filing are all matters of public interest, and often of immediate public concern. Withholding access until a complaint is deemed sufficiently "processed" withholds knowledge from the public that a lawsuit has been filed, who is involved, and what is at stake, until such time as the court clerk determines that a complaint is ready for the public to see.

26. Delayed complaints are less likely to be reported on by the press, and any reports are likely to be less prominent and less likely to come to the public's attention. Delays in access to complaints lead to errors in news reporting about those cases. In addition, the vacuum of

10875130

information after a new complaint is filed but while it is being withheld from public view gives a plaintiff the power to control news about the new litigation, by feeding the news to only those publications the plaintiff chooses. This hurts not only the publications that are "scooped," but the public that is deprived of different viewpoints that come from competing coverage as well.

27. For CNS, delays mean it cannot inform its subscribers, and the public via its website, of newsworthy new actions filed in the Circuit Court in a timely manner. This leads to complaints from subscribers questioning why CNS is reporting on stale news.

**Access To Newly Filed Complaints At The Circuit Court**

28. CNS has covered the Circuit Court for the past twenty years, and for the entirety of that coverage, new paper-filed complaints have been submitted for filing in the Law and Chancery Divisions of the Clerk's Office, located on the 8th floor of the Richard J. Daley Center (the "Daley Center").

29. To review new paper-filed civil complaints, reporters who are stationed in the 7th floor press room take turns throughout the day retrieving new complaints from both sides of the Clerk's Office. All new paper-filed complaints are accompanied by a press copy, which is placed in a black plastic bin or metal wire basket at the window of the individual intake clerk who receives the complaint. In the Chancery Division, reporters reach over the counter to retrieve the press copies from each clerk's basket. In the Law Division, reporters walk behind the counter and pick up the press copies from the basket at each intake clerk's assigned area.

30. After locating all of the new civil complaints from both divisions, the reporter brings those complaints down to the press room, where all of the reporters then take turns reviewing them. When everyone in the press room is done reviewing each batch of new complaints, they are placed in a wire basket by the press room door, where they remain until one

9

of the reporters returns them to the Clerk's Office, typically by noon the following day. Reporters are permitted to stay in the press room even after the courthouse closes to the public at 6:00 p.m., and when the last reporter leaves the press room for the evening, that reporter shuts and locks the door.

31. As a result of these procedures, CNS and other members of the press saw 94% of new paper-filed complaints on the same day they were filed during the four-month period from June 2017 through September 2017.

32. E-filing has – contrary to what one might expect – created delays in access to those new civil complaints that are filed electronically. In fact, in the same four-month time period from June 2017 through September 2017, only about 60% of new e-filings were made available to the press on the same day of filing.

33. Pursuant to both the Illinois Supreme Court's Electronic Filing Standards and Principles ("Standards and Principles"), as amended on September 16, 2014, and the Circuit Court's General Administrative Order No. 2014-02 ("GAO 2014-02), parties may now e-file a civil case 24 hours a day, seven days a week in the Circuit Court. Moreover, e-filed complaints received by the Clerk's Office before midnight on a court day are considered "filed" at the date and time of receipt.

34. When permissive e-filing was first introduced in 2009, the Clerk's Office initially printed out newly e-filed complaints upon receipt, which reporters collected and reviewed alongside the paper-filed complaints, prior to "official acceptance." However, in January 2015, the Clerk's Office stopped printing out new e-filed complaints and instead began withholding them from review until after staff members completed administrative processing tasks. Now, the

Clerk's Office only makes new e-filed complaints available to the press on a delayed basis, after processing and official "acceptance."

35. Starting on June 1, 2017, and continuing through September 29, 2017, CNS tracked the rate and length of delays in press access to newly e-filed complaints in the Chancery and Law Divisions. As shown in the data below, on average, nearly 40 percent – two out of every five – of new e-filed complaints were withheld from press review until at least the following court day, with actual delays stretching up to more than eleven days in some instances.

36. Many complaints that are e-filed well before 4:30 p.m., when the Clerk's Office closes for the day, are withheld from press review, and all complaints e-filed between 4:30 p.m. and midnight on a court business day are withheld, even though the plaintiff receives the benefit of a "filed" date at the date and time of receipt. These delays in access to e-filed complaints in the Circuit Court are particularly problematic because the most newsworthy complaints tend to be filed late in the day, either shortly before the Clerk's Office closes for the day or shortly after it closes.

37. CNS's tracking also reflects access levels with a high degree of variability from day to day. For example, on two days in July, three days in August, and two days in September, *none* of the new e-filed cases could be seen by the press until the following day. In addition, on twelve other days during the tracking period, more than half of all e-filed complaints were withheld.

38. While intervening weekends and holidays can stretch delays to three days or longer, delays of more than one day frequently occur mid-week. For example, seventeen complaints that were e-filed on Wednesday, July 5, 2017, were withheld from the press by the

11

Clerk's Office for a total of six days; and three complaints e-filed on Friday, June 16, 2017, could not be seen until Monday, June 26, 2017 – ten days later.

39. The detailed results of CNS's tracking are as follows:

| DATE | # Reviewed | SD | 1D | 2D+ | DATE | # Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|---|---|---|---|---|
| 6/1/2017 | 38 | 17 | 19 | 2 | 7/3/2017 | 8 | 0 | 0 | 8 |
| 6/2/2017 | 27 | 18 | 0 | 9 | 7/5/2017 | 26 | 0 | 10 | 16 |
| 6/5/2017 | 17 | 12 | 5 | 0 | 7/6/2017 | 20 | 17 | 3 | 0 |
| 6/6/2017 | 21 | 15 | 6 | 0 | 7/7/2017 | 27 | 21 | 0 | 6 |
| 6/7/2017 | 21 | 13 | 8 | 0 | 7/10/2017 | 14 | 10 | 4 | 0 |
| 6/8/2017 | 26 | 15 | 11 | 0 | 7/11/2017 | 27 | 20 | 7 | 0 |
| 6/9/2017 | 30 | 14 | 0 | 16 | 7/12/2017 | 26 | 18 | 8 | 0 |
| 6/12/2017 | 13 | 5 | 8 | 0 | 7/13/2017 | 44 | 36 | 8 | 0 |
| 6/13/2017 | 31 | 19 | 12 | 0 | 7/14/2017 | 10 | 7 | 0 | 3 |
| 6/14/2017 | 19 | 11 | 8 | 0 | 7/17/2017 | 11 | 3 | 8 | 0 |
| 6/15/2017 | 14 | 10 | 4 | 0 | 7/18/2017 | 35 | 23 | 12 | 0 |
| 6/16/2017 | 25 | 15 | 0 | 10 | 7/19/2017 | 34 | 26 | 8 | 0 |
| 6/19/2017 | 21 | 8 | 13 | 0 | 7/20/2017 | 33 | 29 | 4 | 0 |
| 6/20/2017 | 17 | 7 | 10 | 0 | 7/21/2017 | 37 | 34 | 0 | 3 |
| 6/21/2017 | 23 | 15 | 8 | 0 | 7/24/2017 | 31 | 22 | 9 | 0 |
| 6/22/2017 | 24 | 12 | 12 | 0 | 7/25/2017 | 23 | 12 | 11 | 0 |
| 6/23/2017 | 19 | 10 | 0 | 9 | 7/26/2017 | 44 | 31 | 13 | 0 |
| 6/26/2017 | 22 | 16 | 6 | 0 | 7/27/2017 | 33 | 26 | 7 | 0 |
| 6/27/2017 | 20 | 13 | 7 | 0 | 7/28/2017 | 35 | 21 | 0 | 14 |
| 6/28/2017 | 22 | 17 | 5 | 0 | 7/31/2017 | 36 | 26 | 10 | 0 |
| 6/29/2017 | 20 | 12 | 7 | 1 | | | | | |
| 6/30/2017 | 34 | 23 | 0 | 11 | | | | | |

| DATE | # Reviewed | SD | 1D | 2D+ | DATE | # Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|---|---|---|---|---|
| 8/1/2017 | 42 | 31 | 11 | 0 | 9/1/2017 | 26 | 23 | 0 | 3 |
| 8/2/2017 | 29 | 21 | 8 | 0 | 9/5/2017 | 50 | 31 | 19 | 0 |
| 8/3/2017 | 33 | 22 | 11 | 0 | 9/6/2017 | 19 | 16 | 3 | 0 |
| 8/4/2017 | 47 | 44 | 0 | 3 | 9/7/2017 | 29 | 19 | 9 | 1 |
| 8/7/2017 | 33 | 26 | 7 | 0 | 9/8/2017 | 42 | 33 | 0 | 9 |
| 8/8/2017 | 29 | 25 | 4 | 0 | 9/11/2017 | 34 | 26 | 8 | 0 |
| 8/9/2017 | 32 | 25 | 7 | 0 | 9/12/2017 | 35 | 14 | 20 | 1 |
| 8/10/2017 | 22 | 12 | 10 | 0 | 9/13/2017 | 57 | 26 | 5 | 26 |
| 8/11/2017 | 30 | 12 | 0 | 18 | 9/14/2017 | 21 | 2 | 19 | 0 |

12

| Date | | | | | Date | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8/14/2017 | 28 | 15 | 13 | 0 | 9/15/2017 | 35 | 22 | 0 | 13 |
| 8/15/2017 | 26 | 18 | 8 | 0 | 9/18/2017 | 43 | 27 | 13 | 3 |
| 8/16/2017 | 30 | 19 | 11 | 0 | 9/19/2017 | 24 | 17 | 5 | 2 |
| 8/17/2017 | 25 | 9 | 16 | 0 | 9/20/2017 | 26 | 21 | 5 | 0 |
| 8/18/2017 | 24 | 19 | 0 | 5 | 9/21/2017 | 25 | 20 | 5 | 0 |
| 8/21/2017 | 15 | 9 | 6 | 0 | 9/22/2017 | 36 | 16 | 0 | 20 |
| 8/22/2017 | 29 | 21 | 8 | 0 | 9/25/2017 | 43 | 0 | 0 | 43 |
| 8/23/2017 | 34 | 24 | 10 | 0 | 9/26/2017 | 41 | 0 | 11 | 30 |
| 8/24/2017 | 21 | 15 | 6 | 0 | 9/27/2017 | 28 | 2 | 21 | 5 |
| 8/25/2017 | 38 | 25 | 0 | 13 | 9/28/2017 | 31 | 22 | 9 | 0 |
| 8/28/2017 | 35 | 25 | 10 | 0 | 9/29/2017 | 34 | 29 | 0 | 5 |
| 8/29/2017 | 19 | 0 | 0 | 19 | | | | | |
| 8/30/2017 | 24 | 0 | 0 | 24 | | | | | |
| 8/31/2017 | 32 | 0 | 32 | 0 | | | | | |

| Overall | # Reviewed | % |
|---|---|---|
| Same day ("SD") | 1,462 | ~ 60 |
| 1 day delay ("1D") | 601 | ~ 25 |
| 2+ days delay ("2D+") | 352 | ~ 15 |
| **Total** | **2,414** | **100** |

40. These delays are continuing, and are preventing CNS – and by extension its subscribers – from obtaining timely information about important new civil actions. For example, on October 6, 2017, a suit was e-filed in the Circuit Court stemming from injuries a fan suffered at Wrigley Field as the result of being struck in the face by a foul ball while sitting in an area of the stadium that the fan claimed should have been protected by netting. *John Loos v. Major League Baseball and Chicago Cubs Baseball Club,* Case No. 2017-L-010195. However, the complaint was not made available by the Clerk's Office until October 13, 2017, a full week after it was filed. The *Chicago Tribune* apparently received a copy of this complaint from plaintiff's counsel before the Clerk's Office made it available to the public, as it ran a story on the complaint on October 9, 2017, well ahead of when CNS could see the complaint or was even aware that it had been filed. A copy of the Oct. 9 article is attached hereto as **Exhibit B**. Not

13

only is the issue of whether to make protective netting mandatory at every ballpark currently under examination by Major League Baseball, but the Chicago Cubs also hosted its first home playoff game of the postseason at Wrigley Field, a 2-1 victory, on the same date the story ran in the *Chicago Tribune*.

41. Even in situations where CNS is not scooped as a result of the delays in access caused by the Clerk's policy and practice of not allowing access to e-filed complaints until after administrative processing and official "acceptance," delays still hurt news coverage of new civil actions filed in the Circuit Court. For instance, the owner of a 2014 Ford Focus recently sued Ford Motor Company, alleging that her car's PowerShift transmission was defective. *Helen E. Parker v. Ford Motor Company*, Case No. 2017-L-10312.

42. The alleged faulty PowerShift transmission has been a significant issue for Ford Motor Company in recent years, as it has had to defend itself against a separate recently filed class action suit brought on behalf of nearly 7,000 Ford Fiesta and Focus owners over the issue, resulting in the car company extending its powertrain warranty for certain car classes from five years/60,000 miles to seven years/100,000 miles to help cover the problems as part of the class-action settlement. Notwithstanding the newsworthiness of the story, and although the complaint was e-filed in the Circuit Court on October 11, 2017, at 2:46 p.m., it was withheld from press review by the Clerk's Office, and the press and public had no way to learn of this newsworthy new Circuit Court action, until the following day.

43. Another recent instance where the Clerk's unconstitutional policy and practice has harmed CNS's ability to cover and report on the filing of newsworthy civil actions concerns a newly e-filed complaint that was also filed on October 11, 2017. Through the filing of his class action suit for mandamus, a plaintiff representative seeks an order from the court directing the

10875130

Cook County Treasurer, Maria Pappas, to pay the refunds purportedly due to homeowners for overpayments on property taxes that were made on alleged improperly assessed land values before the values were later corrected. *John Mengel v. Maria Pappas*, Case No. 2017-CH-13657. Similar to the complaint that was e-filed against Ford Motor Company, *supra*, this newly e-filed class action complaint was not released for press review on the day it was filed. Instead, it was released the next day, on October 12, 2017, despite it having been received by the Clerk's Office at 3:42 p.m. the day prior.

44. According to the Cook County Treasurer's Office – the same office that defendant Pappas oversees – not only did Chicago homeowners get hit with higher property assessments over the same period at issue in the lawsuit, but the average property tax bill for those homeowners also rose 12.8%. Thus, it follows that news of a new civil lawsuit stemming from a public office allegedly delaying the issuance of refunds to constituents who overpaid property taxes because of mistakes made by public officials, is of great interest to the press and the public, and the Clerk's policy and practice of denying contemporaneous access to such newsworthy information caused significant harm to both.

45. The most efficient way to provide contemporaneous access to newly e-filed civil complaints would be to provide pre-processing access via the computer terminal located in the press room at the Daley Center. This method of providing access – which can be thought of as an electronic in-box – would be available to the press after court hours but while complaints are still being filed, and is similar to what is provided at the vast majority of federal courts and a growing number of state courts. Other options exist as well. The method used to provide contemporaneous access is not the issue. What is important is that the public and press be

15

provided with immediate access to newly filed complaints upon filing and not conditioned on the completion of administrative processing.

46. CNS has attempted to work amicably with the Clerk's Office to resolve the delays in access to e-filed complaints, but has been unsuccessful. Following several months of discussions, by letter dated June 23, 2017, the Clerk's Office stated that new complaints will continue to be made available only after administrative processing, including official "acceptance" and assignment of a case number, has been completed, and that the Clerk's Office "will continue this practice when eFiling becomes mandatory." A true and correct copy of the June 23, 2017 Correspondence from the Clerk's Office is attached hereto as **Exhibit C**.

47. From June 2017 through September 2017, e-filed complaints accounted for nearly half of all civil complaints filed in the Chancery and Law Divisions. By order of the Illinois Supreme Court, all Illinois circuit courts must adopt mandatory e-filing by January 1, 2018. *See* ILL. S. CT., M.R. 18368 (eff. Jan. 22, 2016), a true and correct copy of which is attached hereto as **Exhibit D**. Based on CNS's experience covering the nation's courts as well as the tracking information CNS gathered from June 2017 through September 2017, delays caused by a court withholding press access to new e-filed complaints while it conducts administrative processing and "official acceptance" only become worse and more pervasive when a court transitions from a permissive to a mandatory e-filing environment. Indeed, current trends show access to e-filed complaints is getting worse even as mandatory e-filing draws closer. For the month of September 2017, almost half of all e-filed complaints were withheld from contemporaneous press review.

## COUNT ONE
**Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983**

48. CNS incorporates and repeats the allegations of Paragraphs 1-47 herein.

16

49. The Clerk's actions under color of state law, including without limitation, her policy and practice of withholding newly e-filed complaints from public view until after administrative processing, and the resulting denial of timely and contemporaneous access to new civil complaints received by the Clerk's Office, deprive CNS, and by extension its subscribers and the public, of their right of access to court records secured by the First Amendment to the U.S. Constitution.

50. The First Amendment provides a presumptive right of access to civil court records, including complaints. "In light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous." *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994). The presumption of access can only be overcome by a showing that withholding access "is necessary to preserve 'higher values' and when the suppression is 'narrowly tailored' to serve those interests." *In re Associated Press v. Ladd*, 162 F.3d 503, 506 (7th Cir. 1998) (quoting *Grove Fresh*, 24 F.3d at 897).

51. There is no compelling or overriding interest sufficient to justify Defendant's actions resulting in the denial of timely and contemporaneous access to newly e-filed complaints. And even if a compelling interest sufficient to overcome the First Amendment existed, there are far less restrictive means of protecting any such interest. As such, Defendant's policy and practice are not narrowly tailored.

52. CNS has no adequate remedy at law to prevent or redress the Clerk's unconstitutional actions, and will suffer irreparable harm as a result of the Clerk's violation of CNS's First Amendment rights. CNS is therefore entitled to declaratory and both preliminary

and permanent injunctive relief to prevent further deprivation of the First Amendment rights guaranteed to CNS, its subscribers, and other readers of its content.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Courthouse News Service seeks judgment in its favor and against Defendant Dorothy Brown, in her official capacity as Clerk of the Circuit Court of Cook County, Illinois, as follows:

1. For preliminary and permanent injunctions against Defendant, including her agents, assistants, successors, employees, and all persons acting in concert or cooperation with her, or at her direction or under her control, prohibiting her permanently from continuing her policy and practice resulting in delayed access to new e-filed civil complaints, including, *inter alia*, her practice of denying access to new e-filed complaints until after administrative processing, including but not limited to official "acceptance," and requiring Defendant to provide timely, contemporaneous access to new e-filed civil complaints;

2. For a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Defendant's policy and practice that knowingly result in delays in access to newly e-filed civil complaints as unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution, for the reason that Defendant's policy and practice constitute an effective denial of access to newly e-filed civil complaints that Plaintiff is constitutionally entitled to access and review;

3. For an award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

4. For all other relief the Court deems just and proper.

10875130

Date:   November 2, 2017	Respectfully submitted,

                                                                                     BRYAN CAVE LLP

                                                                                     By:  /s/ Brian A. Sher

Brian A. Sher, ARDC 6196964
Donald A. Cole, ARDC 6299318
BRYAN CAVE LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
Tel: (312) 602-5000
Fax: (312) 602-5050
brian.sher@bryancave.com
donald.cole@bryancave.com

*Attorneys for Plaintiff*
*Courthouse News Service*