# EXHIBIT A

Rachel Matteo-Boehm (SBN 195492)
rachel.matteo-boehm@bryancave.com
Roger Myers (SBN 1461640)
roger.myers@bryancave.com
Jonathan G. Fetterly (SBN 228612)
jon.fetterly@bryancave.com
Leila C. Knox (SBN 245999)
leila.knox@bryancave.com
BRYAN CAVE LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105-2994
Telephone: (415) 675-3400
Facsimile: (415) 675-3434

Attorneys for Plaintiff
COURTHOUSE NEWS SERVICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Courthouse News Service,<br><br>        Plaintiff,<br><br>vs.<br><br>Michael Planet, in his official capacity as Court Executive Officer/Clerk of the Ventura County Superior Court,<br><br>        Defendant. | Case No. CV11-08083 SJO (FMMx)<br><br>**DECLARATION OF WILLIAM GIRDNER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF COURTHOUSE NEWS SERVICE**<br><br>Date: April 18, 2016<br>Time: 10 a.m.<br>Judge: Hon. S. James Otero |

I, William ("Bill") Girdner, declare and state as follows:

1.      I am the editor and publisher of Courthouse News Service ("CNS"), based in Pasadena, California. CNS is a nationwide legal news service and the Plaintiff in the above-captioned action. I have personal knowledge of the following facts and could testify to them if called as a witness.

1

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

2.      I started the precursor to CNS in 1990, when I began publishing a biweekly in paper format called the Central District Almanac, reporting new civil actions, motion arguments and rulings, and trials in the U.S. District Court for the Central District of California. I began doing business as "Courthouse News Service" in 1997, and I incorporated CNS in 1997. CNS specializes in news reporting on the civil record, from the inception of a civil action on through motions, rulings, trial and judgment, and finally to appellate arguments and decisions. We summarize all the opinions of appellate courts in every state in the nation and all federal appellate courts, including the U.S. Supreme Court, providing a link to full copies of the opinions.

3.      In building the news service, prompt access to the court record was and is a fundamental necessity for its survival and later its success. That basic requirement for news coverage was demonstrated by the access given to journalists in federal and state courts throughout the nation. In court after court, our reporters, working alongside other journalists, reviewed late in the afternoon a stack, tray, media bin or press box that held new civil complaints received for filing earlier that day. In turn, the importance of the news contained in the new civil actions was shown by the number of journalists from a wide variety of publications who checked the new filings alongside CNS at the end of the day.

**CNS Subscribers**

4.      As of the date of this declaration, CNS has more than 2,700 subscribers nationwide, consisting mainly of law firms, news organizations, law schools, government offices, public utilities, entertainment companies and watchdog groups. The majority of subscribers are law firms, with more than 500 of those firms having at least one office in California.

5.      Our subscribers in the entertainment and news media include, but are not limited to, *Austin American Statesman*, AOL/The Huffington Post, *The Atlanta Journal Constitution*, *The Boston Globe*, *D Magazine*, *The Dallas Morning News*,

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

2

*Detroit Free Press*, Fox Entertainment Group, *Houston Chronicle*, *Los Angeles Times*, *Los Angeles Business Journal*, *Pacific Coast Business Times*, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal* and Warner Bros., as well as a host of TV stations.

6.     CNS's news media subscribers rely on us to provide them with timely information about civil litigation, our specialty, so they can provide information about those cases to their own readers and viewers.  In recent years, as the traditional news industry has withered, we have seen an increasing number of news organizations become CNS subscribers.  At the same time, we have seen news organizations cut back on court coverage.  The end result is that in many courts, CNS effectively serves as a pool reporter, with its reporter sometimes the only journalist reviewing the new civil complaints.

7.     In addition to its law firm and media subscribers, CNS subscribers include many academic institutions, such as Baylor College of Medicine, Boston College Law School, Boston University, Case Western Reserve University, Drake University Law School, Harvard Law School, Loyola Law School, MIT School of Management, Southern Illinois University School of Law, University of Arkansas Law, University of Pittsburgh, University of South Florida, University of West Los Angeles, UC Hastings College of Law and UCLA School of Law.

8.     A number of city attorneys also subscribe, for example those in Los Angeles, Bakersfield, Oakland, Santa Monica and San Diego, as well as watchdog groups such as the Center for Public Integrity.

**CNS Publications**

9.     CNS offers a variety of publications.  One category is its popular New Litigation Reports, which contain original, staff-written summaries of significant new civil complaints.  These reports are sent to subscribers via email each evening. The New Litigation Reports do not cover criminal or family law matters, and in California state courts, they only cover unlimited jurisdiction cases.  Prior to the

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

3

DECLARATION OF WILLIAM GIRDNER                                   CASE NO. CV11-08083 SJO (FFMX)

1  unification of superior and municipal courts in California's state court system, CNS

2  covered only superior courts (where what are now called "unlimited" complaints

3  were filed).

4       10.    Among CNS's other news publications are its trackers, which allow

5  subscribers to follow developments in an ongoing civil case, and its dingers, which

6  alert subscribers that a new lawsuit has been filed against a particular party or on a

7  topic of interest.  Both the dingers and trackers are sent to subscribers via e-mail

8  throughout the day, as we become aware of a new complaint, subsequent filing or

9  ruling.  CNS also publishes four print newsletters: the *Four Districts Almanac* (what

10  was formerly the *Central District Almanac* but now includes reporting on all four of

11  California's federal district courts), the *Environmental Law Report*, the *Securities*

12  *Law Report*, and the *Entertainment Law Digest*.  CNS also publishes in electronic

13  form the Daily Brief, which summarizes and links to nearly all published appellate

14  rulings in the nation, state and federal.

15       11.    CNS also publishes news reports and commentary on its web site at

16  www.courthousenews.com.  The web site is updated daily with staff-written articles

17  reporting on a wide range of political and legal events, including political

18  campaigns, congressional hearings, environmental and other agency decisions, new

19  lawsuits, trials and appellate arguments and opinions.  In one recent example, the

20  February 10, 2016, edition of our web site featured articles on presidential candidate

21  John Kasich drawing big crowds in South Carolina; visa waivers for travelers to

22  Iran, U.S. readiness to combat the Zika virus; a Ninth Circuit en banc hearing on

23  ineffective assistance of counsel; a California courts futures commission session on

24  peremptory challenges; a science story on the deciphering of the genome of the

25  Lyme Disease-carrying black tick; the guilty plea of ex-Sheriff Lee Baca; and a

26  Utah Senate committee's unanimous declaration of a "pornography crisis."  A true

27  and correct copy of a screen shot of CNS's February 10, 2016, home page is

28  attached as **Exhibit 1**.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

4

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

12.     Readership of the CNS web site has grown steadily over the years and for the last 3 years has drawn about 1 million readers per month.  Reports from CNS's web site are frequently picked up by news outlets and disseminated to a much broader audience.  Attached hereto as **Exhibit 2** are true and correct copies of recent examples of reports from other media outlets where CNS is credited, including *ABA Journal*, ABC News, Al Jazeera, *The Atlantic*, *Austin American-Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, The Daily Beast, *The Christian Science Monitor*, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, NBC News, *New York Daily News, New York Magazine*, *The New York Times*, NPR, *The Orange County Register*, Politico, *The Telegraph* (UK), *Rolling Stone*, *San Antonio Express-News*, Slate, *The Washington Times*, *Women's Health Policy Report*, *U.S. News and World Report*, *USA Today*, *The Washington Post*, UPI and others.  In addition, U.S., Canadian, and New Zealand radio shows have interviewed CNS reporters.

13.     CNS covers approximately 2,600 state and federal trial and appellate courts around the nation, spanning all 50 states in the United States.  However, like any news organization, CNS must work within financial limitations.  We cannot send a reporter every day to every court we cover.  In less populated areas, CNS reporters visit their assigned courts once a week, once every two weeks, or, in very small courts, once a month.  Where a court publishes new civil complaints on the Internet, reporters sometimes cover the court remotely.

14.     To provide comprehensive level of reporting on the nation's court system, CNS employs more than 250 editors and reporters who are based throughout the nation.  I am both the editor, with final responsibility for the timeliness and content of all our reports and our web page, and the publisher, with final responsibility for the distribution of the reports, the hiring of reporters, their overall conduct and duties, and business decisions involving CNS.  The reporters are

5

Case 2:17-cv-07933 Document 1-1 Filed: 11/02/17 Page 7 of 42 PageID #:26
Case 2:11-cv-08083-SJO-PPM Document 112-2 Filed 03/17/16 Page 2 of 292 Page ID
#:3953

hired by bureau chiefs who report to me on the candidates prior to any employment offer, and I work with and give direction to the bureau chiefs in an ongoing manner. As the editor, I determine the scope and frequency of our coverage of any particular court or topic. I frequently give direct instruction to reporters and edit sensitive stories before publication. I also direct the tone and overall content of the CNS webpage through meeting and regular consultation with the web page editors. As the publisher, I have final say on the financial decisions, on any litigation and on software programming projects.

### CNS's New Litigation Reports

15. Even as CNS's web site has gained in growth and popularity, the New Litigation Reports remain one of the most popular CNS publications. Because CNS's publications do not feature advertising and thus we have no advertising revenue, the subscription income from the New Litigation Reports is a large part of CNS's overall fiscal health, and supports its free web site.

16. In California, CNS publishes 16 New Litigation Reports, which include daily coverage of new litigation filed in all four California federal district courts as well as daily coverage of many California superior courts.

17. Overall, CNS publishes 122 New Litigation Reports, including some reports that cover only one court and other reports that cover a number of courts. Among those, the New Litigation Report titled "Central Coast Report" covers the Superior Court of California, County of Ventura ("Ventura Superior") and a number of other courts along California's central coast.

18. In smaller courts, where reporters do not visit every day, they ask to see the new complaints filed since their last visit. In larger courts, CNS reporters visit the court every court day, towards the end of every court day, and ask for and review new civil complaints filed earlier that day. The reporter then writes an original summary of each complaint of likely interest to CNS subscribers, including cases against business and public entities and cases against individuals where the

DECLARATION OF WILLIAM GIRDNER | CASE NO. CV11-08083 SJO (FFMX)

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

1    nature of the dispute or the parties involved are newsworthy.  Those summaries are

2    compiled and published in the New Litigation Report featuring that court, which is

3    distributed to its subscribers via e-mail on the evening of the same day.

4           19.    As CNS has grown, the frequency of coverage in many courts has

5    increased.  In some courts, we started with once-a-week coverage and then moved to

6    daily coverage.  The reasons for ramping up the frequency of coverage include

7    volume of litigation, prevalence of newsworthy cases, competitive pressure, overall

8    budget and availability of reporters in the particular geographical region.

9           20.    Any delay in access to newly filed complaints necessarily creates a

10   delay in our ability to inform subscribers of the factual and legal allegations in those

11   complaints.  As is discussed elsewhere in this declaration, a delay of one court day

12   is significant, and when there is an intervening weekend or holiday, a delay of one

13   court day becomes a delay of three or four calendar days.

14          21.    On occasion, court officials have suggested that access to a docket

15   entry or a cover page of a complaint is sufficient for reporting purposes.  A docket

16   entry is devoid of the substance of the allegations.  It is impossible to tell the story

17   of a complaint from a docket entry.  The same is true for a cover page of a

18   complaint.

19          22.    CNS reporters are instructed that they should report promptly on the

20   new complaints they review, as required by CNS's Style Manual given to all

21   reporters and editors, a true and correct copy of which is attached as **Exhibit 3**.  In

22   paper filing courts, it is CNS's custom and regular practice to publish its reports on

23   new complaints for courts it covers every day on the same day CNS receives access

24   to the complaints.  The same general principle applies to e-filing courts, except that

25   where complaints can be e-filed at any time of the day or night, on any day of the

26   week (including weekends and court holidays), the unavailability of remote online

27   access or a publication deadline may limit CNS's ability to include a complaint filed

28   in the evening in that day's report.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA  94105-2994

7

Case: 1:17-ne-07993 Document #: 1-1 Filed: 11/02/17 Page 9 of 42 PageID #:28
Case 2:11-cv-08083-SJO-PPM Document 124 Filed 03/14/16 Page 3 of 299 Page ID
#:3955

23.    For those courts where CNS's reporter visits every day, delays in access to new civil complaints can typically be determined by reviewing the New Litigation Report that includes coverage of that court.  For each complaint identified in a New Litigation Report, CNS provides the date the complaint was filed in the left-hand column following the case name and parties.  Thus, for paper filing courts, a delay in access to any complaint CNS reports on can be readily determined by comparing the filing date of the new complaint with the publication date for that report.  The same is generally true in e-filing courts, except that complaints filed in the evening may not be reported until the following day.

24.    I spot check individual New Litigation Reports and compare their publication date with the filing date of the new complaints summarized in the reports, to ensure timeliness.  Bureau chiefs are required to monitor the reports within their regions of responsibility to ensure timeliness of reporting and consistency in style.  In addition, CNS employs an auditor who rotates through the New Litigation Reports, auditing their completeness and timeliness by comparing the contents of the reports with the court's online docket information over a ten-day period.

### Access To Civil Complaints in California

25.    I started covering the Los Angeles federal courthouse on Spring Street in the 1980s as a journalist writing news articles for *The Boston Globe* and *The New York Times*.  Among a host of famous trials in that courthouse, I attended and reported on the 1984 trial of John DeLorean on drug trafficking charges, which was followed internationally and on which he was acquitted.  I worked out of the press room, which at the time was on the third floor, across from the jury rooms.

26.    In my experience, a traditional task for a reporter on the court beat is to check the new complaints at the end of the day.  I and the rest of the reporters in the press room would regularly go into the clerk's office between 4:00 and 5:00 to look over a stack of new civil complaints filed in the Central District of California, all

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

filed in paper form. That group included reporters for United Press International ("UPI"), the *Los Angeles Times*, Copley News Service, *The Orange County Register*, *Los Angeles Daily News* (the "*Daily News*") and City News Service. We reviewed a stack of new complaints filed that day, long before they were docketed. That tradition of press access in the Central District continues into the electronic present. The Court has adopted a form of e-filing where new complaints flow into public view on courthouse terminals or online via PACER, immediately upon receipt, even on nights and weekends, and before any court employee has taken any action with regard to the new complaint, which allows for very timely reporting.

27.     In 1990, I began publishing our original biweekly, the Central District Almanac, because I thought a great deal of news in the courthouse was not being reported, and civil cases received almost no coverage. The Central District Almanac included articles on civil rulings, motion arguments and civil trials in the Central District. It also appended summaries of new civil complaints that I reviewed every court day. In 1992, based on expressions of interest from subscribers, I began faxing a daily report summarizing that day's newsworthy new civil complaints.

28.     In 1993, I walked over to the Stanley Mosk Courthouse of what is now known as the Superior Court of California, County of Los Angeles ("Los Angeles Superior") and began covering its new civil complaints, all filed in paper form. Together with reporters from the *Los Angeles Times*, *Los Angeles Daily Journal*, City News Service and UPI, I checked out a cart that held that day's new civil complaints and petitions. A court employee brought the new complaints from the intake counter in batches, including a last batch when the filing window closed at 4:30. Reporters stayed in the records room to review the new complaints until 5:00, after the general public was asked to leave the records room at 4:30. The complaints had not been docketed. That tradition has been carried forward into the present. Based on my direct supervision of CNS's Los Angeles Superior reporter, and my own personal observation, I am aware that new unlimited civil complaints, still in

9

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

1   paper form, are filed in the Stanley Mosk Courthouse and promptly scanned on the

2   day of filing, before docketing. Reporters review the scans of new complaints

3   through terminals in the courthouse press room.

4        29.    In 1994, I hired a former UPI reporter to cover the federal and state

5   courts in San Francisco for our news service. In 2001, I visited the clerk's office of

6   the Phillip Burton Federal Building, which houses the U.S. District Court for the

7   Northern District of California in downtown San Francisco, where I observed our

8   reporter go behind the counter to review new complaints filed that same day,

9   regardless of whether they had been docketed. She was also able to check bins

10  holding complaints being sent to the Oakland and San Jose divisions of the court.

11  Working in the press room alongside CNS and also reviewing the new civil

12  complaints were journalists from the *San Francisco Chronicle*, *National Law*

13  *Journal*, and Bloomberg News. That tradition of same-day access continues into the

14  present where journalists review new complaints on terminals at the courthouse

15  when they are received, before any action is taken by a court clerk. These same

16  complaints can be seen online via PACER, immediately upon receipt, whether the

17  complaint is filed during the work day, after hours or on weekends.

18       30.    CNS's coverage of the San Francisco Civic Center Courthouse, which

19  houses the Superior Court of California, County of San Francisco, also began in

20  1994. On a visit to the court in 2001, I and other journalists entered the records

21  room on the ground floor of the courthouse, presented a driver's license, signed in

22  and left a driver's license as collateral. We then went into a large hall behind the

23  intake counter that housed shelves of records as well as docket clerks who worked

24  immediately behind intake clerks at the counter. Reporters worked at a set of carrels

25  placed between the record shelves and the docketing clerks. Journalists gathered the

26  new complaints directly from the intake and docketing clerks and put them in a bin

27  kept at the reporters' carrels. Reporters from *San Francisco Recorder*, Bloomberg

28  News, *San Francisco Examiner, Los Angeles Daily Journal and The Wall Street*

DECLARATION OF WILLIAM GIRDNER         CASE NO. CV11-08083 SJO (FFMX)

*Journal* also used the reporters' station to review new complaints and case files kept in the shelves. In 2001, Clerk Gordon Park-Li met with me and about five other journalists to establish a protocol for access to new complaints. The result was a written memorandum promising same-day access to the new actions "whether or not the cases have been entered in the computer," which remains in effect today. A true and correct copy of that written protocol is attached as **Exhibit 4**.

31. In 1995, I went to what is now known as the Superior Court of California, County of Orange ("Orange County Superior") on Civic Center Drive in Santa Ana and – along with reporters for *The Orange County Register*, *Los Angeles Times*, *Los Angeles Daily Journal* and City News Service – I checked a wooden box at the back of the records room containing that day's new civil complaints, all filed in paper form. The records room was next to the intake counters. I watched as a records room clerk gathered up the new complaints from the intake clerks at the end of the day to give to reporters, who reviewed the new actions on the same day they were received, before docketing.

32. In approximately 1995, CNS also began covering new federal complaints filed in the Santa Ana Division of the U.S. District Court for the Central District of California. In 1999, I observed CNS's reporter collect new complaints from a clerk at the intake counter of that division before they were docketed. He reviewed them in the press room on the ground floor of the courthouse, then passed the new actions under a window to docketing clerks on the other side. That immediacy of review continues today through public computer terminals and online via PACER where the new cases are seen as soon as they are e-filed, without intervention by clerks.

33. In 1996, I started our coverage of U.S. District Court for the Southern District of California and hired our first reporter there. Based on my personal observation as well as my direct supervision of the reporter I hired, I know that for many years after his hiring (until the advent of e-filing) he was provided with a

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

DECLARATION OF WILLIAM GIRDNER      CASE NO. CV11-08083 SJO (FFMX)

paper copy of the newly filed complaints as soon as they crossed the counter, before docketing. That tradition continues into the present where, at the end of the day, reporters review printouts of the new complaints e-filed via PACER that day in the Southern District, regardless of whether they have been processed by court employees.

34. Also in 1996, at the Hall of Justice Courthouse of what is now known as the Superior Court of California, County of San Diego ("San Diego Superior"), I reviewed a black binder with face pages of new superior court civil complaints, from which I asked for the full copies of new complaints. Unlike almost every court I visited during the period, San Diego Superior did not have a tradition of providing journalists with prompt access to the new civil actions. The face pages were generally not available until the next court day, and even when the face pages were available, it was often difficult to obtain the new complaint itself, as the clerk's office required that new cases pass through a docketing quality control desk before they became public.

35. In 1996, I also set up our coverage of the Santa Clara County Superior Court at the First Street courthouse in San Jose. I went through a swinging wooden gate next to the counter in the records room on the ground floor. I reviewed the new superior court civil complaints received earlier that same day and placed in a cardboard box on an empty desk behind the counter. They had not been docketed. While I was there, a reporter from a small local publication was also reviewing the new actions. These procedures changed over the years, however, and in April 2010, the court's Chief Executive Officer, David Yamasaki – who, as I understand from documents Mr. Planet produced in this case, has communicated with Mr. Planet about this case – took the position in a letter to CNS's counsel that "our Court must process a new complaint in order for it be 'filed.'" A true and correct copy of this letter, dated April 23, 2010, is attached as **Exhibit 5**.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

12

DECLARATION OF WILLIAM GIRDNER                                    CASE NO. CV11-08083 SJO (FFMX)

36.     In 1998, I set up our coverage of the Robert T. Matsui United States Courthouse for the Eastern District of California.  Chief Deputy Clerk Pat Sandlin provided me with access to the new complaints received earlier that day in a narrow area outside the intake windows.  It is my understanding, based on my direct supervision of the reporter we hired to cover the court, that in 1998 he reviewed the new complaints from behind the counter on the day they were filed, before they were docketed.  The tradition has continued into the present.  The Eastern District now provides access to the newly e-filed complaints on the day they are received, without any processing by court employees, via public terminals at the courthouse or online via PACER.  Some of the new cases have permanent numbers and other still have "AT" numbers, temporary numbers assigned to a case upon receipt.

37.     I would note that in my experience, e-filing and PACER do not work the same in all federal district courts.  In my experience, there are three general categories.  First, there are several federal district courts around the country, such as those in the Eastern District of California, Northern District of New York, District of New Jersey, Northern District of Georgia and District of Montana, in which CNS sees new complaints with either an individual temporary number or a common shell number immediately upon their receipt by the court, before any processing by court officials and before the assignment of a permanent case number.  Second, there are a few federal district courts, such as those in the Southern District of California, District of Utah and the Northern District of Alabama, in which the filer emails a new complaint to the court in an electronic format and clerks then manually create a docket and enter any necessary information into their computers, just as they did when cases were delivered across the counter in paper format.  However, virtually all federal district courts in this category have worked out ways to provide timely-same-day access to the press and do not condition a reporter's ability to review the complaint on processing.  The third and most common protocol, used by the Central District of California and the majority of federal district courts nationwide, is based

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

13

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

1   on automatic assignment of a permanent case number and public availability

2   through PACER immediately upon receipt of the e-filed complaint, regardless of

3   whether the new complaint is received during the court day, after hours or on

4   weekends.  I would note that even under this last system, because the deadline for

5   publication of CNS's New Litigation Reports is in the early evening, the few

6   complaints filed into the court late in the evenings or on weekends, while accessible,

7   are not reported in our New Litigation Reports until the following day.

8       38.     Also in 1998, I visited the Gordon D. Schaber Courthouse housing the

9   Superior Court of California, County of Sacramento ("Sacramento Superior"),

10  where a bin was kept just inside the intake counter holding the previous day's civil

11  complaints.  Reporters reviewed the complaints at a small, wooden desk outside the

12  counter.  Years later, after delays grew to extraordinary lengths, the court's

13  presiding judge issued a standing order in 2011 requiring that filers submit a copy of

14  new civil complaints for public review, an order that is being enforced by the clerk's

15  office.  It is my understanding, based on my supervision of the reporter and personal

16  efforts to resolve access issues in that court, that a "Public Access Bin" now sits on

17  a table outside the counter, across from the intake clerks.  Journalists, including the

18  CNS reporter, review the new actions at a nearby desk.  The result is same-day

19  access to the new complaints, all filed in paper form, long before docketing.

20      39.     Also in the late 1990s, I visited the Superior Court of California,

21  County of Alameda ("Alameda County Superior") at the Rene C. Davidson

22  Courthouse on Fallon Street.  I and other reporters checked out a wooden box from a

23  clerk in the records area of the clerk's office, containing new complaints filed that

24  day.  The same day tradition continues today, which I know due to having

25  personally managed issues relating to access at Alameda County Superior over the

26  years.  Complaints are still filed in paper form.  A rudimentary docket is created

27  immediately upon filing, similar to an intake log, that can be viewed on the court's

28  website.  The civil complaints are then scanned and attached to that preliminary

docket. If at the end of the day, some cases have not been scanned and attached, reporters send an email to the court and the scans are promptly made available for review, on terminals at the courthouse and on the court's website. The result is a high percentage of same-day access for unlimited civil cases at Alameda County Superior, currently more than 90%.

## Same Day Access To Civil Complaints Nationwide

40.     I began expanding CNS's coverage outside California in 1997, with New York as the first stop. At the Daniel Patrick Moynihan United States Courthouse for the Southern District of New York, I met with Assistant District Executive Gary Lee in 1997. His assistant showed me to the intake area, where an intake clerk handed me a bin containing that day's new complaints. I reviewed them standing at a narrow counter directly across from the intake windows, before they were docketed, as did other journalists. I then hired a reporter to cover the court. These same basic procedures have been carried forward into the present, where e-filed complaints can be viewed on computer terminals in the press room or online via PACER immediately upon receipt by the court, before any processing is done by court employees.

41.     On the same 1997 trip to New York City, I visited the New York County Courthouse on Foley Square housing the Civil Branch of the Supreme Court of the State of New York, New York County, and met with Norman Goodman, the County Clerk of New York County. Chief Deputy County Clerk James Rossetti showed me behind the counter in the clerk's office where the new complaints were stacked on a desk for reporters to review. I and other journalists, including reporters from the Associated Press, Bloomberg News, *New York Post* and *Daily News*, reviewed general civil actions and commercial actions at the end of the day on which they were filed. The new cases had not been docketed and we saw every single complaint received that day up until the filing window closed. I then hired a reporter to cover the court. Beginning in 2013, the court began mandatory e-filing

15

for most civil and commercial complaints, which has resulted in delayed review of new actions filed in the last hour of the court day. As of the date of this declaration, CNS is working with court officials in an effort to address this issue.

42.    In Chicago, in 1997, I visited the Everett M. Dirksen United States Courthouse for the Northern District of Illinois. I met with Clerk Michael Dobbins, who took me behind the counter in the filing area and showed me two shallow bins where journalists checked the new complaints and the new rulings. While I was reviewing the new actions, intake clerks would turn around and place just-filed complaints in the complaints bin. Reporters for City News Service, *The Sun Times* and *Chicago Tribune* worked in the court's press room and checked the new actions and rulings on a daily basis. I then hired a reporter to cover the court. Now that complaints are e-filed, reporters have access free of charge to the new e-filed complaints through public terminals at the courthouse or online via PACER immediately upon receipt, before any processing by a court employee.

43.    Also in 1997, I went to the Richard J. Daley Center, which houses the Cook County Circuit Court in Chicago. I met with Marie Tabata, assistant to Clerk Aurelia Pucinski. Ms. Tabata took me behind the counter into the filing area for the Law Division to show me where reporters reviewed the new complaints. Reporters from *Chicago Tribune, The Sun Times* and *Chicago Daily Law Bulletin* regularly went from the press room into the Law Division and checked the new complaints. We picked up the new complaints from a tray next to intake clerks before they were docketed and reviewed them at an empty desk nearby, staying as late as a supervisor was present. Similarly, I checked new complaints filed in the Chancery Division by reviewing the new cases on the day they were filed, behind the counter, before they were docketed. I then hired a reporter to cover the court. The great majority of new complaints continue to be filed in paper form in Cook County, and reporters still review them on the day of receipt, before docketing.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

44.     In New Jersey, in 1998, I went to the Martin Luther King United States Courthouse housing the Newark Division of the District of New Jersey, where I reviewed new complaints on the day they were received, before they were given case numbers and docketed.  I then hired a reporter to cover the court.  In 2001, the clerk's office attempted to delay press access until the new cases were docketed and the docketing was checked.  A bureau chief for AP, an editor for the *Bergen County Record* and I argued for a reversal of the new policy.  Ultimately, Chief Judge Anne Thompson returned traditional, same-day access to the press corps, prior to docketing.  A true and correct copy of Judge Thompson's letter to me on the matter is attached as **Exhibit 6**.  The tradition has been carried forward as the court moved to e-filing complaints, by providing the media with a press queue that can be viewed through terminals at the courthouse and online, where newly e-filed cases are given a common generic number as they are received.  Those cases can be reviewed by reporters before assignment of a permanent case number and any processing by the clerk's staff.  The new complaints can also be immediately reviewed through a PACER account online whether they are filed during the work day, after hours or on the weekend.

45.     In 1999, I met with Clerk Michael Milby at the Bob Casey Federal Courthouse for the Houston Division of the Southern District of Texas.  His staff showed me the press room and introduced me to the intake clerk, who handed me a plastic bin with new complaints received for filing earlier that same day.  I then hired a reporter.  Today, we see e-filed cases on public terminals at the courthouse immediately upon receipt, before any processing by court clerks.

46.     Also in 1999, I met with Charles Bacarisse, the elected clerk at the Harris County Civil Courthouse in Houston, who expressed enthusiasm for press reporting on the court.  I was given access to new complaints (called "petitions" in Texas state courts) on the day they were filed.  I hired a reporter who was permitted behind the intake counter, where he collected a stack of the day's new complaints

17

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

1   from the cashier, was allowed to work at an unoccupied desk and could stay until

2   the last supervisor left, at the end of the day.  Press access changed dramatically

3   after Loren Jackson was elected to the clerk's office in November 2008.  Mr.

4   Jackson excluded the CNS reporter from behind the intake counter, and denied

5   access to the new petitions until they had been "indexed" (i.e., information about

6   them had been entered into the clerk's computers) and "verified" (i.e., the data entry

7   had been checked to make sure the case number, court, title of document and

8   category were all accurate).  As a result, access to both e-filed and paper-filed

9   complaints was withheld from the media until after these administrative tasks were

10  completed, with paper-filed documents withheld even longer because CNS's

11  reporter was not permitted to review them until they had gone through the additional

12  step of being sent to "Central Data Processing," scanned, and made available for

13  electronic viewing.

14        47.     After attempting unsuccessfully to resolve these access delays through

15  meetings and discussions with court officials, CNS filed a 42 U.S.C. § 1983 lawsuit

16  in June 2009 against the Harris County District Court clerk and his deputy clerk in

17  the U.S. District Court for the Southern District of Texas ("Southern District of

18  Texas").  This was the first time in the history of CNS – the only other time being

19  the present action – that it had filed a lawsuit over the issue of access delays.  The

20  case was captioned *Courthouse News Service v. Jackson*, Case No. H-09-1844.  On

21  July 20, 2009, the Southern District of Texas entered an Opinion and Order of

22  Preliminary Injunction, a true and correct copy of which is attached as **Exhibit 7**,

23  directing the defendants to provide access to the new civil petitions on the same day

24  they were filed, except where the filing party was seeking a temporary restraining

25  order or other immediate relief or had properly filed the pleading under seal.  In its

26  decision, the Southern District expressly "disagree[d]" with defendant's contention

27  that the "'slight delay' in availability is a reasonable time, place or manner

28  restriction," and held that defendant's "administrative goal of getting online and not

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

in line" failed to rise to the level of other paramount interests that might justify withholding access to the new complaints. On March 2, 2010, the Southern District of Texas entered an Agreed Permanent Injunction and Final Judgment, a true and correct copy of which is attached as **Exhibit 8**, requiring the Harris County District Clerk to continue to provide such same-day access, with carve-outs for certain extraordinary circumstances. The clerk has complied with that order by posting complaints on its website on the day they are received for filing.

48. In 2000, I met Clerk Karen Mitchell at the Dallas Division of the U.S. District Court Northern District of Texas in the Earle Cabell Federal Building. She introduced me to the counter clerks, who provided me with the new complaints received earlier that same day, in their original paper form, before they were docketed. I then hired a reporter to cover the court. When I returned to hire another reporter in 2004, many of the new complaints were scanned but not fully processed, and could be seen on a same-day basis on public terminals in the clerk's office. In the present day, the new complaints are reviewed by our reporter on computer terminals at the courthouse, on the day they are received for filing, before processing by court employees. New complaints flow into public view on PACER immediately upon receipt by the court, whether the complaint is filed during the day, after hours or on weekends.

49. On the same visit to Dallas in 2000, I also met with Clerk Jim Hamlin at the George Allen Senior Courts Building of the Dallas District Court. He introduced me to Virginia Etherly, the chief of operations, who provided me with a list of new civil petitions filed that day and the new petitions themselves, which I reviewed at a big table in the clerks' lunch area adjacent to the processing clerks. I then hired a reporter. Now that Texas courts have transitioned to e-filing, the timeliness with which the press can gain access to new petitions varies, a result of what I understand to be the current clerk's practice of withholding access until after petitioners are either "opened" or "accepted" by the clerk.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

19

Case 2:11-cv-08083-SJO-PPM Document #: 1-1 Filed: 11/02/17 Page 21 of 42 PageID #:40
Case 2:11-cv-08083-SJO-PPM Document 1-1 Filed 08/18/11 Page 20 of 42 Page ID
#:3967

50.     At the U.S. Courthouse for the Austin Division of the U.S. District Court for the Western District of Texas, I met with Clerk Leigh Lyon in 2003. After our meeting, Ms. Lyon began scanning the new complaints on intake and making the scans available on a public terminal in the clerk's office, before they were docketed. I hired a reporter on that same trip, and observed that intake clerks gave our reporter the latest complaints at the end of the day in paper form prior to docketing. On a return visit to the court, I saw that a reporter for the *Austin American-Statesman* had started reviewing the newly filed civil actions. The electronic equivalent of this tradition continues today, with the new complaints flowing automatically into view on public terminals at the courthouse upon receipt, before any action is taken by the clerk.

51.     Also in Austin in 2003, I visited the Travis County courthouse on Guadalupe Street and met with Clerk Amalia Rodriguez-Mendoza. I recall asking for a bin of new civil petitions from a tall, white-haired gatekeeper who, as best I can recall, was named Billy. The cases in the bin were generally from that day, but I could also go directly to the docketing clerks and ask for new actions that were not in the bin. With the introduction of e-filing in recent years, CNS has at times had issues with the timeliness of access, which it has so far been able to resolve through reasonable discussions with the clerk's office. It is my understanding that these periodic problems stem from the fact that press access is withheld until after petitions are either "opened" or "accepted" by a clerk.

52.     I traveled to Seattle in November 1999 to visit the courthouse for King County Superior Court and meet with its then-Clerk Michael Planet, who is now the clerk of Ventura Superior and the Defendant in this case. Prior to the meeting, I had learned though my own attempts to review new civil complaints that they were being withheld by the clerk's office until about two weeks after a filing. Mr. Planet met with me for a few minutes at a table in the snack room next to his office, and heard my request for more timely access to the new complaints. He told me the

1  court's budget had been reduced by a recent referendum, and I should try again

2  when the Legislature proposed a new budget. Three years later, Presiding Judge

3  Richard Eadie arranged with a new clerk to allow timely press access to new civil

4  complaints before docketing.

5        53.    In sharp contrast to my meeting with Mr. Planet, I had a meeting on the

6  following day with U.S. District Court Clerk Bruce Rifkin at the William Kenzo

7  Nakamura United States Courthouse in Seattle. We had a long conversation in his

8  office and Mr. Rifkin expressed strong interest in helping the press cover his court.

9  He then introduced me to the intake clerks. I was handed new complaints filed in

10  the Western District of Washington on the day they were filed, before they were

11  docketed. That tradition has carried forward into the present where all civil

12  complaints are e-filed. The court provides access to new complaints immediately

13  upon receipt, free of charge via computer terminals at the courthouse (or online

14  through a PACER subscription), which I can tell takes place before any processing

15  is undertaken by court personnel because they flow into public view online late into

16  the evening, long after the clerk's office has closed.

17        54.    I visited the Minneapolis courthouse of the United States District Court

18  for the District of Minnesota in 2004. All civil complaints were filed in paper form.

19  I reviewed an electronic intake log on a computer terminal and asked for new

20  complaints from a counter clerk named Deborah. For the cases filed late in the day,

21  she would copy the just-received cases and hand them to me, before they were

22  docketed. If I wanted to keep the copies, I paid for them. If not, I handed them

23  back to her. The court now provides immediate access to e-filed complaints prior to

24  processing, free through public terminals at the courthouse or paid online through a

25  PACER subscription.

26        55.    On the same 2004 visit to Minneapolis, I met with Hennepin County

27  District Court Administrative Manager Laurie Kusek at her office in the Hennepin

28  County Government Center in Minneapolis. She said she understood the role of the

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

DECLARATION OF WILLIAM GIRDNER          CASE NO. CV11-08083 SJO (FFMX)

1    press and the court supported that role. She then introduced me to other officials in

2    the clerks' office on the second floor of the government center, and showed me

3    behind the counter into the docketing section. The new actions were stacked on a

4    small table outside the cubicles of the docketing clerks and I reviewed them at an

5    empty table nearby. I, and later the CNS reporter, saw new cases on the day they

6    were filed, before they were given case numbers. As part of the same visit to the

7    area, I also went to the Ramsey County Courthouse in neighboring St. Paul. I went

8    behind the counter and reviewed the new actions filed in the district court at a table

9    next to the docketing clerks. The cases had been filed earlier that same day.

10       56.    In 2004, I visited the federal and state courts in New Orleans. At the

11   United States District Court for District of Louisiana, I found that the press could

12   only review new civil complaints after they were docketed, commonly resulting in a

13   two-day delay. I met with and wrote to Clerk Loretta Whyte, who rejected my

14   request for more timely access. CNS's counsel in New Orleans then wrote to Chief

15   Judge Helen Berrigan in October 2004. The following month, a clerk's office

16   employee named Gene Smith called me to work out a better method for press review

17   of the new complaints. Within a few days, our reporter began receiving new

18   complaints from the docketing clerks and was able to review them on the day of

19   filing. The tradition continues today with e-filing. New civil complaints flow

20   automatically into public view through the PACER system, either through public

21   terminals at the courthouse or online, immediately upon receipt, without any action

22   by a court employee.

23       57.    Also in 2004, I visited the Civil District Court Building for the New

24   Orleans Parish District Court, where I met with Clerk Dale Atkins. She allowed me

25   to ask processing clerks for any new complaints they were working and to sit at a

26   desk directly next to the clerk who pulled the checks off new complaints and

27   accounted for them. I would review the stack of new complaints after the checks

28   were removed, generally on the day they were received for filing.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

22

---

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

58.     I began traveling less after 2004 and asked CNS's bureau chiefs to handle the initial contact as we continued expanding to new courts.  However, when necessary, I visit courts in person, and frequently communicate with court officials, either verbally or in writing, on matters related to press access.

59.     In late 2012, for example, as part of my supervision of our reporter who covers the Fort Wayne Division of the U.S. District Court for the Northern District of Indiana, I learned that the clerk's staff had stopped placing cover sheets of complaints on the counter, taking the position that new complaints were not "official" until they could be seen on PACER.  The cover sheets had allowed our reporter to ask for the full complaints, filed in paper form, and review most of them on the day they were filed, regardless of whether they had been docketed or made available for electronic viewing on PACER.  I wrote to Chief Judge Philip Simon in January 2013 asking for reinstatement of the prior policy.  Clerk Robert Trgovich emailed me a week later, saying the court would be reinstating the former system of access in all three of the court's divisions.  True and correct copies of my letter to Judge Simon and the clerk's subsequent email to me are attached as **Exhibit 9**.

60.     Last year, in 2015, I traveled to Hawaii to help hire reporters there, and I found that the practice of same-day press access to new complaints is well in place throughout the Hawaiian islands.  At the Ka`ahumanu Hale Courthouse on Punchbowl Street in Honolulu, I reviewed a stack of new paper complaints received for filing earlier that same day, as did a reporter for the city's principal newspaper, the *Honolulu Star-Advertiser*.  The complaints had not been docketed.  The same press access was already in place in all the island courts I visited, including those in Kealakekua and Hilo on the island of Hawaii, Lihui on the island of Kauai and Wailuku on the island of Maui.

**Importance of Timely Access**

61.     In the course of 25 years as the Editor of CNS and its predecessor publication, I have kept a focus on the issue of prompt press access to new civil

DECLARATION OF WILLIAM GIRDNER                               CASE NO. CV11-08083 SJO (FFMX)

complaints. I frequently discuss the timeliness of our news reports with CNS editors and reporters. I review New Litigation Reports on a regular basis, comparing the publication date and the filing date of the complaints reported. CNS reporters are also instructed that they should report promptly on the new complaints they review. Failing to report on all the cases made available on a given day brings a warning and then dismissal. CNS reporters are also instructed that they should try to resolve access delays themselves through discussions with the clerk's office, but if they are unsuccessful in doing so, they should bring any delays in access to their bureau chief's attention so that problems can be resolved through reasonable discussions with court officials.

62. I regularly – once a month as a rough average – field complaints from our subscribers about late reporting, asking why a new complaint was reported late. When complaints from subscribers come to my attention, I respond directly because I believe the reputation of CNS is at stake. I will investigate the reason for the delayed reporting and give the subscriber an explanation, which is sometimes the fault of a reporter or a technical problem on the side of CNS, but more often is due to a clerk's policy or practice of withholding access.

63. A delay in access of even one court day means that news is delayed by a full news cycle. When there is an intervening weekend or holiday, or both, the delay extends up to four days. And it has been CNS's experience that the more important actions tend to be filed late in the day, making them particularly prone to extended delays in press access where courts condition access on processing, as has been the practice of Mr. Planet at Ventura Superior.

64. Prompt and complete access aids accuracy in news reporting. In those instances where courts withhold access to complaints until well after docket information about them is available, news about a new complaint comes out through bits and pieces of docket information, and is prone to inaccuracies because the actual complaint is not available. As a result, the public and CNS subscribers are

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

given information that is far inferior to a full, timely, and accurate description of the factual and legal allegations contained in the complaint itself. On the other hand, when we see an important case on the day it is filed, we can write a story and place it high on our web page "above the fold," which means for a print newspaper that it is visible in a newsstand, and for an electronic page that it can be seen on the web page when it is first opened, without having to scroll down. In my experience, when access to new complaints is withheld for a day or more, news organizations are less likely to run a story, and if they do, they are likely to play it down, where it receives less attention.

65.     Based on my many years as a journalist covering the courts and my personal experience overseeing CNS, I have found that most news reporters stop checking the flow of new complaints when access is delayed and sporadic. The result is that a whole area of traditional reporting goes dark, and information only comes out through leaks. When court officials keep the new complaints away from the press, the power to control news on the initiation of litigation goes over to the plaintiff. The plaintiff is able to feed the news to a friendly publication and generally ensure prominent and favorable coverage in exchange for exclusive access. Those news organizations that exercise diligence by attempting to review the new actions at the courthouse and decide for themselves which ones are newsworthy are then scooped by the favored publication, reflecting negatively on the reporters and their publications, such as CNS, that attempt to cover the courts in a thorough and professional manner.

66.     For example, on March 24, 2014, in a case captioned *City of Buenaventura v. United Water Conservation District*, 562014-00450810 CU-WM-VTA, the City of Buenaventura (also known as Ventura) sued a groundwater supplier, challenging the supplier's policy of charging city residents three times the rate it charged agricultural users. The *Ventura County Star* published a story about the suit the following day, March 25th on its online web site, titled "Ventura sues

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

DECLARATION OF WILLIAM GIRDNER                          CASE NO. CV11-08083 SJO (FFMX)

1   groundwater supplier for third time." The docket entry for the case appeared on the

2   court's website a day later, on March 26, 2014. Despite repeated requests for the

3   full complaint from our reporter, the clerk's office withheld access until April 11,

4   2014, more than two weeks after the filing date. True and correct copies of the

5   complaint, the *Star*'s story on the complaint, and CNS's later reporting on the

6   complaint, are attached hereto as **Exhibit 10**.

7        67.    Similarly, at Orange County Superior – which, like Ventura Superior,

8   now also withholds access to new complaints until they are docketed, a matter I

9   discuss more fully below – the Orange County District Attorney and the Santa Clara

10  County Counsel filed an action against major drug makers including Johnson &

11  Johnson and Purdue Pharma LLC. The action, captioned *People v. Purdue Pharma*,

12  Case No. 00725287CXC, alleged a sophisticated and deceptive campaign to create

13  blockbuster profits by reversing the common and correct understanding that opioids

14  are addictive, in order to sell medication for chronic pain. That case bore a file

15  stamp of May 21, 2014, but access to the complaint was withheld by the clerk's

16  office at Orange County Superior until May 29, 2014, more than a week later. The

17  *Los Angeles Times*, in the meantime, published a story on the day of filing, May 21,

18  on its web site, together with a copy of the complaint with no stamps of any kind but

19  with the signature of Orange County District Attorney Tony Rackauckas, whose

20  office I believe almost certainly provided the complaint to the newspaper. True and

21  correct copies of the complaint we eventually received from the clerk's office,

22  CNS's news coverage of the complaint, the *Times*' story on the complaint, and the

23  copy of the complaint we obtained from the *Times*' web site are attached as **Exhibit**

24  **11.**

25        68.    Based on my many years as a journalist covering the courts and my

26  personal experience overseeing CNS, I have found that the initiation of litigation

27  can affect many people beyond the litigants. When courts withhold access to new

28  complaints, the ability of lawyers, professors, law students, news reporters and

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

DECLARATION OF WILLIAM GIRDNER         CASE NO. CV11-08083 SJO (FFMX)

readers of our web site to know about and freely discuss a new legal contest pending in a public court of law is suppressed. A lawyer's ability to advise clients about new litigation in a timely manner is impaired. A news organization's ability to follow the story is damaged. The goodwill of CNS, which is relied on by subscribers to give them thorough and timely reports on new litigation, is reduced. The public's interest in a major case declines, and the ability of the public to comment on events in an important public institution is cut down.

69. Court officials have from time to time suggested that CNS should obtain new complaints from the filing lawyer, based on docket information or face pages to complaints provided by the court. But a filing lawyer has no obligation to either respond quickly or provide a news reporter with any document at all. In addition, it is not unusual for filing lawyers, including on occasion those from government agencies, to avoid publicity and seek to downplay the filing of a new complaint. Moreover, unless the filing lawyer contacts reporters to let them know a particular complaint has been filed, there is often no way for a reporter to know about its existence on the day of filing other than access to the complaint itself through the clerk's office. While most courts provide docket information about new filings, including Ventura Superior and many other courts, docket information is itself often delayed.

**Access Problems At Ventura Superior and This Lawsuit**

70. CNS began covering Ventura Superior in 2001. I hired Julianna Krolak in 2003 to cover Ventura Superior and she has done that job from 2003 to the present day. Initially, CNS covered the court on a weekly basis. In roughly 2008, the clerk's office began imposing limitations on Ms. Krolak's ability to review the files. At my direction, by letter dated April 29, 2009, CNS's counsel wrote to Court Executive Officer Michael Planet to bring to his attention CNS's concerns about access to new complaints at the Ventura County Superior Court, including problems with the timeliness of that access, and to suggest an in-person meeting. A true and

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

27

1  correct copy of that letter is attached as **Exhibit 12**.  This letter led to a temporary

2  improvement in access to new civil unlimited complaints, but the delays soon

3  resumed.

4       71.  In November 2010, I decided to send Ms. Krolak to the court every

5  court day, in an effort to do everything within CNS's control to improve coverage of

6  the court despite the access problems.  At about the same time, I instructed her

7  editor, Chris Marshall, to once again try to work with the court to resolve the access

8  delays, which were at that time ranging from days to weeks.  After those efforts

9  proved unsuccessful, at my direction, CNS's counsel once again wrote to Mr.

10  Planet, by letter dated June 20, 2011, to request that its reporter have same-day

11  access to new civil complaints as is common and traditional in other courts where a

12  reporter visits on a daily basis.  Together with that letter, CNS's counsel enclosed a

13  survey, dated June 2011, of access procedures then used by many of the courts CNS

14  covers on a daily basis.  A true and correct copy of that letter and the access survey

15  that accompanied it is attached as **Exhibit 13**.

16       72.  Mr. Planet responded by letter dated July 11, 2011, a true and correct

17  copy of which is attached as **Exhibit 14**.  In that response, Mr. Planet referred to

18  budget reductions – the same justification he offered for access delays when he was

19  clerk in King County, Washington – and informed us that "the Court must ensure

20  the integrity of all filings, including new filings, and cannot make any filings

21  available until the requisite processing is completed."

22       73.  At my direction, CNS's counsel responded by letter to Mr. Planet dated

23  August 2, 2011, a true and correct copy of which is attached as **Exhibit 15**.  That

24  letter noted that other superior courts in California, as well as all four federal district

25  courts in California, grant the press same-day access to new complaints, in many

26  instances before processing, and that same day access need not cost any money at

27  all.  After we failed to receive a response to that letter, and with delays in access that

28  were at that time ranging from one day to three weeks based on information I

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

28

1  received from our Ventura County reporter and confirmed based on my review of

2  recent editions of the Central Coast Report, CNS filed the instant lawsuit. Together

3  with its complaint, CNS filed a motion for preliminary injunction and supporting

4  papers

5      74.    After the district court's November 2011 order granting Mr. Planet's

6  motion to dismiss on federal abstention grounds and before the Ninth Circuit's

7  reversal of that order of dismissal on April 7, 2014, I received a letter from Mr.

8  Planet dated December 21, 2011. Enclosed together with that letter was the October

9  31, 2011 Declaration of Cheryl Kanatzar (the "Kanatzar Declaration"), which Mr.

10  Planet had previously filed in the district court in opposition to our motion for a

11  preliminary injunction. In the letter, Mr. Planet stated, among other things, that

12  "[t]he declaration explains why we cannot provide the 'same-day access' guarantees

13  Courthouse News previously demanded." A true and correct copy of Mr. Planet's

14  December 21, 2011 letter and the enclosed Kanatzar Declaration is attached as

15  **Exhibit 16**.

16      75.    At my direction, CNS's counsel responded to this letter by letter dated

17  January 20, 2012, to Mr. Planet's counsel, Robert Naeve of Jones Day. The letter

18  corrected several misstatements and misconceptions in Mr. Planet's December 21

19  letter, noted access delays in December 2011 and January 2012 that continued to

20  range from days to weeks, and stated that CNS would welcome any specific

21  proposals from Mr. Planet for addressing the ongoing delays while the parties

22  continued to litigate the district court's November 2011 order of dismissal in the

23  Ninth Circuit. A true and correct copy of our counsel's January 20, 2012 letter is

24  attached as **Exhibit 17**.

25      76.    CNS did not receive any response to this letter, and the access delays at

26  Ventura Superior continued unabated. In my review of our tracking of the delays,

27  access to the largest group of new complaints was delayed by 2-6 court days. To

28  make matters worse, the oldest cases were often the most important, such as the

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

29

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

Case 2:11-cv-08083-SJO-PPM   Document #: 1-1   Filed: 11/02/17 Page 31 of 42 PageID #:50
Case 2:11-cv-08083-SJO-PPM   Document 12-1   Filed 03/14/16   Page 30 of 292   Page ID
#:3977

1    class actions and environmental cases.  For example:

2    • On March 26, 2013, Ojai's 100-year-old private water company, represented

3      by Manatt Phelps, filed for writ of mandate to stop an eminent domain

4      proceeding initiated by a neighboring municipal water district.  The municipal

5      water district planned to pay for the acquisition through a levy on all property

6      owners in Ojai, according to the petition (a fact that could not be deciphered

7      from the docket sheet).  But Ventura Superior withheld press access to the

8      petition in *Golden State Water Company v. Casitas Municipal Water District*,

9      Case No. 56-2013-00433986-CU-WM-VTA, until April 24, 2013, four weeks

10     after it was received for filing.  That case affected many people, including all

11     the homeowners of Ojai.  But CNS's inability to report on that suit prevented

12     the public from reading, discussing, or knowing about it for almost a month.

13   • On January 24, 2013, shareholders filed a derivative action against Amgen

14     directors in a case captioned *Purnell v. Sharer*, Case No. 56-2013-00431078-

15     CU-SL-VTA, alleging a breach of fiduciary duty in the promotion, through

16     kickbacks, of off-label uses for drugs that were not reimbursed by federal

17     insurance programs.  Ventura Superior withheld access to the new complaint

18     until March 20, 2013, nearly two months after it was filed.  The inability of

19     CNS to report on that new complaint was detrimental to the public's ability to

20     know about and discuss major litigation impacting public health.

21   • On May 1, 2013, a commercial farm near Piru sued the Ventura County

22     Board of Supervisors in a case captioned *Rancho Camulos LLC v. Ventura*,

23     Case No. 56-2013-00436825-CU-WM-MTA, alleging harm to its agricultural

24     interests caused by county plans to construct a 32-mile recreational trail.  The

25     original Rancho Camulos was a stop on the Camino Real, was the setting for

26     Helen Hunt Jackson's famous 1884 novel "Ramona," and is now a national

27     historic landmark near Piru maintained by the Rancho Camulos Museum.

28     But Ventura Clerk's office denied press access to the new complaint, until

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

30

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

May 22, 2013, three weeks after it was filed. The inability of CNS to promptly review and report on that case damaged the public's ability to know about an important issue involving local business and recreation.

77.     After the Ninth Circuit issued its first opinion in this case on April 7, 2014, we finally started to see an improvement, with more paper copies of the new complaints in the media bin on the day they were received for filing.  Then in June 2014, the clerk's office of Ventura Superior started a scanning program that allowed the press to see electronic scans of a substantial number of new complaints on the day they were received, although those scans did not contain exhibits and attachments, and some complaints continued to be delayed.  The press access provided through the scanning program has been incomplete and inconsistent, with the percentage of cases made available on the same day dropping to 50% or below on some days.

## Attempts To Redefine "Filing" To Justify Access Delays

78.     It is my understanding, based on my review of the deposition transcripts in this action and responses to CNS's written discovery requests, that even after having implemented his June 2014 scanning program, Mr. Planet continues to take the position that a new unlimited civil complaint is not "filed," and the public and press do not have a right of access to the complaint, until after the complaint has been "processed" by court staff, regardless of how long "processing" takes.  It is also my understanding, based on my review of the same materials, that at Ventura Superior, "processing" includes but is not limited to entering information about the complaint in the Court Case Management System ("CCMS"); any necessary "quality control" of that data entry (i.e., a supervisor has checked the data entry to make sure it is correct); a summons has issued; a "filed" stamp is affixed and backdated to the date the case was received by the court; and the complaint has been put in a physical file folder.  I also understand Mr. Planet has taken the position his June 2014 scanning program is a mere "customer service," which in my

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

1  experience tells me it is subject to termination for "budget" or "efficiency" reasons

2  or any other reason at any time.

3        79.    I strongly disagree with Mr. Planet's definition of "filing" and his view

4  of when the press should be permitted to review a new civil unlimited complaint.

5  As a journalist covering the courts and at the helm of CNS for the last 26 years, it

6  has been my experience that "filing" has traditionally and commonly been

7  understood to mean the act of passing something, generally a document, across the

8  intake counter at the court clerk's office for filing.  In my experience, a document is

9  commonly understood to have been "filed" when it is received by the court.  The

10  later work of creating a docket sheet – which in recent years has meant entering

11  information into an electronic case management system such as the CCMS system

12  used at Ventura Superior – is traditionally called "docketing."  With e-filing, what

13  used to be called docketing is now often called "acceptance," "processing," or

14  "opening," but the underlying principle remains true: once a document crosses the

15  electronic equivalent of the intake counter and is received electronically by the court

16  – it is "filed."  The practice of courts like Ventura Superior, which backdate the

17  "filed" date stamped onto a complaint back to the date the complaint was received,

18  even when that stamp is affixed days after receipt, illustrates the tradition that a

19  document is considered filed upon receipt.

20        80.    Unfortunately, Mr. Planet is not the only state court clerk who has

21  expressed the view that a complaint is not "filed" and is not a public record until

22  after it has been processed.  In my capacity as editor of CNS, I have seen a trend in

23  recent years in which a handful of state court clerks have started taking a hard line

24  on press access to new civil actions, refusing to allow journalists to see the new

25  complaints on the date they are received, which is typically also the date reflected

26  by the belatedly affixed "filed" stamp.  Instead, these clerks are taking the position

27  that these new complaints are not "filed" or are not properly public records the press

28  should see until after they have been "processed" or "accepted."  The result is what I

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

32

call a "black hole" where the new complaint has been received by the court, is in fact filed, but is being withheld from the press until processing takes place.

81.     It has been my experience that even those state court clerks who had not previously taken this position sometimes adopt it at the time they transition to electronic filing.  My observation is that the most effective method of maintaining traditional access to new civil complaints after a transition from paper to e-filing is through an electronic press box, also known as an electronic inbox; that is, an electronic queue, either remotely online or viewable at a courthouse terminal, where new complaints flow automatically into public view, without a need for clerk action. Such a system is already in place in numerous federal courts, including the four federal district courts in California, as well as individual state courts in Nevada, Georgia, Connecticut, Alabama, and Utah.

82.     One of the clerks who has been most strident in the position that a complaint is not a public record until after it has been processed or formally "accepted" is Alan Carlson, the Clerk and Court Executive Officer of Orange County Superior, who I understand – based on documents produced by Mr. Planet in this lawsuit – has communicated with Mr. Planet about this lawsuit.  Like Ventura Superior, Orange County Superior was an early adopter of CCMS, and Mr. Carlson has stated to me that he does not believe the press should have access to new civil actions e-filed in his court until after they are officially "accepted" into the court's docketing system, which has created a multi-day black hole, where a complaint has been received but is being withheld until that docketing is completed.

83.     Orange County Superior's e-filing program, in turn, was the driving force behind the introduction, in 2012, of proposed California Rules of Court pertaining to e-filing that, for the first time in California, created a new category of court records: those that have been "officially filed," as opposed to "filed" for all other purposes.  Under the rules as proposed in 2012, a document would not be "officially filed" until after "the processing and review of the document" by court

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

33

staff, however long that might take. Concerned that the "officially filed" concept would provide court administrators with an excuse for denying public records that have been "filed," under the long-understood meaning of that term, until after processing and "review" by court staff, a host of media entities, including CNS, Los Angeles Times Communications LLC, the Bay Area News Group, The Press Democrat Media Company, California Newspaper Publishers Association, Californians Aware, and the First Amendment Coalition (the "Press Group") submitted written comments objecting to the "officially filed" category in January 2013. True and correct copies of the Press Group written comments (including joinders by Los Angeles Times Communications LLC, the Bay Area News Group, and The Press Democrat Media Company) and exhibits thereto, together with the invitation to comment, are attached hereto as **Exhibit 18**. The response to these objections, included in pages 34-36 of a report to the California Judicial Council dated June 28, 2013, recommended adoption of the "officially filed" designation notwithstanding the Press Group comments. I recently learned that the "officially filed" concept was in fact adopted as part of the California Rules of Court. True and correct copy of the June 28, 2013 report, attached hereto as **Exhibit 19**, is also available on the California Courts web site at http://www.courts.ca.gov/documents/jc-20130628-itemC.pdf.

84. It is my belief the concept of an "officially filed" document in these e-filing rules is part of the same effort by Mr. Planet, Mr. Carlson, and a handful of other state court clerks who have taken the position that a new civil complaint is not "filed" and not a public record until after it is processed or officially "accepted," to provide a justification for pushing press access back behind that work by the staff.

**Press Access Withheld In CCMS Courts**

85. I do not believe it is a coincidence that in California, the state courts clerks who have been the most militant in denying public access to new complaints until after processing were also deeply involved in the campaign to implement

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

1  CCMS in California trial courts.  As CNS has itself extensively reported on its web

2  site, and as I understand from my personal involvement in that news reporting, the

3  CCMS project became an enormous financial drain on the California court system.

4  Between approximately 2010 and 2012, CNS, through its website, chronicled the

5  rising anger of trial judges in California's state courts, who saw their courts starved

6  and their employees laid off, while the CCMS software project siphoned hundreds

7  of millions of dollars to the private consultant that developed the system, until the

8  project was terminated in 2012.  As noted on a document entitled "Fact Check:

9  Whatever Happened to the California Case Management System," available on the

10  California Courts web site, five California state courts still use CCMS: the Superior

11  Courts of California for the Counties of Orange, Sacramento, San Diego, San

12  Joaquin, and Ventura.  A true and correct copy of the "Fact Check" document is

13  attached as **Exhibit 20** and is also available on the California Courts web site at

14  http://www.courts.ca.gov/21775.htm.

15      86.    According to pages 1-2 of a report to the legislature by the Judicial

16  Council of California, Administrative Office of the Courts, a true and correct copy

17  of which is attached as **Exhibit 21** and is also available online at the California

18  Courts website at http://www.courts.ca.gov/documents/status-ccms-2009.pdf, in

19  2002, a governance structure for CCMS was established, which included a Steering

20  Committee made up of, among others, the court executive officers for the Superior

21  Courts for the counties of Orange, Sacramento, San Diego and Ventura.

22      87.    Also in approximately 2002, Orange County Superior's then-clerk,

23  Alan Slater, closed the court's press room and set about dismantling press access to

24  the new complaints, first pushing press access back to the day after filing and then

25  further back behind docketing and scanning.  In 2003, *Los Angeles Times* reporter

26  Monte Morin and I met with Carole Levitsky, Media Relations Director for Orange

27  County Superior, to request a return to same-day review of the new complaints.  Ms.

28  Levitsky was expressing agreement with our request, when Mr. Slater came quickly

DECLARATION OF WILLIAM GIRDNER            CASE NO. CV11-08083 SJO (FFMX)

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

1  out of his office in an agitated state. He expressed his willingness to fight the matter

2  out in court.

3    88.    As for San Diego Superior, in answer to a long campaign by CNS in

4  which I was personally involved, which included a tour of the clerk's intake process

5  and repeated meetings and discussions with San Diego Superior officials, the clerk's

6  office agreed in 2006 to improve press access through a "Pilot Project" that allowed

7  review of the new actions immediately after the filing fees had been paid. The pilot

8  program allowed the press to see the new complains right after they were received

9  and was successful in providing same-day access to the new complaints in the North

10 County Division of San Diego Superior and to a lesser extent in the Central Division

11 downtown. In January 2011, I wrote a column entitled "A Drunken Sailor,"

12 criticizing the amount of public funds being spent on CCMS, noting the

13 extraordinary length of time needed to docket new cases in CCMS, and quoting a

14 San Diego Superior clerk's employee who said she would return to the court's

15 former case management system "in a heartbeat." A true and correct copy of that

16 column, as published on CNS's web site on Jan. 27, 2011, is attached as **Exhibit 22**.

17 Later that same year, San Diego Superior Clerk and Court Executive Officer

18 Michael Roddy, who I understand from documents produced by Mr. Planet in this

19 lawsuit has also communicated with Mr. Planet about this case, cancelled the pilot

20 project for the press in favor of his own pilot project that involved scanning

21 documents, which started in August 2011. Since then, the San Diego Superior

22 clerk's office has taken the position new civil complaints – both paper and e-filed –

23 can only be reviewed on a computer terminal, and only after they have been

24 docketed into CCMS. Press access to the great majority of the new actions is

25 withheld by one or two days or more after they are received for filing.

26    89.    CNS has also experienced delays in access at Sacramento Superior, and

27 as is the case with Mr. Roddy and Mr. Carlson, documents produced by Mr. Planet

28 in this case also show that Mr. Planet has communicated about this case with Dennis

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

Case 2:11-cv-08083-SJO-PPM Document 11-1 Filed: 11/02/17 Page 38 of 42 PageID #:57
Case 1:17-cv-07933-PPM Document 1-1 Filed: 08/14/18 Page 37 of 293 Page ID
#:3984

Jones, who was previously Sacramento Superior's court executive officer. Because access to the new civil unlimited complaints had become erratic and slow, I met in May 2007 with Sacramento Superior Division Manager Maureen Dumas. The meeting was extremely positive, and she promptly put in place a pilot program where newly filed actions were placed in a bin for the press to review between 4:00 and 5:00 on the day they were received, after checks had been removed and before they were docketed. But within a few months, Ms. Dumas had left the court and the clerk's staff terminated the pilot project – just as the court executive officer was implementing CCMS. The delays in access stretched into weeks. In November 2011, Judge Steve White issued a standing order requiring filers to include a public access copy with their case-initiating documents, eventually resulting in same-day access to nearly all new unlimited civil complaints, long before they are docketed.

### The Ventura Clerk's Attempt to Justify Access Delays

90.     It is also my understanding that, in addition to the position advanced by Mr. Planet that a new complaint is not a document to which the public has a right of access until after it has been processed, Mr. Planet and his staff have advanced several other reasons to support their practice of withholding access to new civil complaints until after processing. Based on my 26 years of experience working with courts on procedures for press access to complaints, I do not believe those positions have any merit.

91.     The most common argument by clerks trying to justify withholding access is to cite the court's budget. That argument was invoked by Mr. Planet in Seattle and again in this case with respect to Ventura Superior. In my experience covering the courts and overseeing CNS, the new complaints filed in paper form tend to accumulate in a single stack for docketing. Allowing a timely review of new actions only requires letting journalists see that stack. It is my understanding, from reading transcripts of deposition testimony by Mr. Planet's representatives in this case, that new unlimited civil complaints in Ventura accumulate in a single stack on

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

37

a single "new filings" desk.  In my experience, allowing a CNS reporter to simply look at that stack does not require expensive equipment or undue time from court staff.

92.     In addition, it is my understanding that Mr. Planet and his staff object to press access prior to processing on the ground that they must assure the "integrity" of the files to avoid loss, destruction or damage.  A journalist has no fathomable reason for damaging a public document.  I have also consistently supported measures taken by courts to assure accountability in the review of the new complaints that have not yet been processed.  In my experience working with courts over many years, those measures can include requiring that reporters leave identification before reviewing new complaints; a check-out system that allows court administrators to track the complaints given to a reporter for review; requiring reporters to undergo a background check; or requiring a letter from the reporter's employer.  Another method of addressing this concern is to allow reporters to review new civil complaints behind the intake counter or in another secure room such as a viewing room or a press room, although it is not required.  And still another method – one that Ventura Superior eventually adopted a version of, although only after the Ninth Circuit's April 2014 ruling in this case – is to scan new complaints on intake and make the electronic versions of those complaints available for media review while the paper versions are being processed.

93.     A third common argument, and one also used by Mr. Planet, is that press review will disrupt the efficiency of the clerks.  In paper courts, the new actions normally sit in one stack in one place for a day or days at a time, as they do in Ventura.  It is normally possible to review the stack at the end of the day without interrupting any work.  Alternatively, I have worked alongside the main docketing clerk in the United States District Court for the Central District of California.  I would first look over the complaints that Barbara, the main docketing clerk at the time, had already docketed, then those she had not yet worked on, and finally any

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA  94105-2994

38

that she had been entering while I reviewed the rest.  CNS reporters have done the same at the courts they cover.

94.      Mr. Planet also argues that delaying media access to new civil complaints until after they are processed is necessary to protect the "privacy" of litigants.  But it is my understanding that per California Rule of Court 1.20, the responsibility for redacting certain identifiers lies with the filing party, and specifically states that "[t]he court clerk will not review each pleading or other paper for compliance with this provision."  Any other information a filing party seeks to protect on privacy grounds would be accompanied by a motion to seal, and CNS is not asking to see complaints that are the subject of a motion to seal.  I also understand Mr. Planet bases his privacy argument on fee waivers.  In my experience, a fee waiver is a separate document, which does not contain news of any kind, that is easily separated from a complaint before a reporter's review of the complaint.  I am aware that CNS's California state court reporters will sometimes see a completed form FW-003, Order on Court Fee Waiver; however, that order does not itself contain any personal financial information.  Rather, the document that would contain personal financial information is a separate form, FW-001, called "Request to Waive Court Fees," as evidenced by the section of the California Courts Judicial Branch web site, http://www.courts.ca.gov/formnumber.htm, that provides copies of forms for use in California state courts.

95.      It is my understanding Mr. Planet has also justified his practice of delaying access until processing on the grounds of "accounting protocols" – i.e., concerns that complaints frequently have filing fee checks attached.  We review new actions on the day they are filed in many state and federal courts.  Those courts normally remove checks, sometimes writing the associated case number on the check, or else process payment before we review the new complaints.  It is my understanding that in a few courts, CNS reporters review new complaints with checks still attached, although it is a procedure I disfavor.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA  94105-2994

39

96.     I also understand Mr. Planet contends that delaying access until after processing is necessitated by concerns about "quality control," in that he does not want to allow access to new civil complaints that may be rejected for filing or are in some way incomplete.  In state and federal courts in California and around the nation, we see new complaints on the day of receipt, even though the cases may later be rejected for one reason or another.  I believe it does not make sense to withhold press review from the great majority of new complaints that are correctly filed in order to avoid seeing the small minority that, for one reason or another, might be returned to the filer.  In addition, I have never seen any harm resulting from press review of a new complaint that is later rejected.  In my view, a complaint that is received by a court for filing is something the public should be able to see even if it is later rejected.  In addition, from my experience complaints that are rejected for some technical deficiency are usually resubmitted as soon as the problem is corrected.

97.     It is my understanding, based on my review of the transcripts of the depositions of several of Mr. Planet's representatives in this action and my direct involvement with access issues at Ventura Superior, that it has been the practice of Mr. Planet's office to send several categories of new actions to judges immediately after processing. That policy has resulted in even further delays in access to those complaints.  Those categories of actions include "complex" cases, often the most weighty and wide ranging new complaints, as well as complaints invoking the California Environmental Quality Act ("CEQA"), often of great news interest.  In courts large and small in California, state and federal, reporters see complex cases, including class actions and environmental actions, before they are sent to a judge's chambers.

98.     The variety and effectiveness of the procedures for providing same-day access that have been implemented in so many state and federal courts has convinced me that press access is largely a matter of will.  I have observed that it is

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105-2994

DECLARATION OF WILLIAM GIRDNER                    CASE NO. CV11-08083 SJO (FFMX)

Case: 1:17-cv-07983 Document #: 1-1 Filed: 11/02/17 Page 42 of 42 PageID #:61
Case 2:11-cv-08083-SJO-PPM Document 124 Filed 03/14/16 Page 41 of 293 Page ID
#:3988

1  entirely possible, where the clerk's office has the will, to provide the press with

2  access to the flow of new complaints coming into the clerk's office, on the day they

3  arc received for filing, before docketing or processing, or, where the clerk's office is

4  docketing right away, alongside the docketing clerks, without interrupting the work

5  of the court's staff.

6    I declare under penalty of perjury under the laws of the United States that the

7  foregoing is true and correct.

8    Executed at Pasadena, California on this 8th day of March 2016.

9

10  _____

    William Girdner

DECLARATION OF WILLIAM GIRDNER    CASE NO. CV11-08083 SJO (FFMX)