## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>        Plaintiff,<br><br>        v.<br><br>DOROTHY BROWN, in her official capacity as the Clerk of the Circuit Court of Cook County, Illinois,<br><br>        Defendant. | Case No: 17-cv-7933<br><br>Honorable Matthew F. Kennelly |

## DECLARATION OF WILLIAM GIRDNER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, William Girdner, declare and state as follows:

1.      I am the editor and publisher of Courthouse News Service ("CNS"), a nationwide news service and the Plaintiff in the above-captioned action. CNS is similar to other news wire services, such as the Associated Press, except that CNS specializes in news reporting about civil lawsuits, from the date of filing through the appellate level.

2.      As editor of CNS, I have final responsibility for the timeliness and content of all CNS news reports. As publisher, I have final responsibility for the distribution of the reports, the hiring of reporters, their overall conduct and duties, and business decisions involving CNS. I have personal knowledge of the following facts, except where otherwise stated, and could testify to them if called as a witness.

3.      I make this declaration in support of CNS's motion for a preliminary injunction directing Defendant Dorothy Brown, sued in her official capacity as Clerk of the Circuit Court of Cook County, Illinois ("Clerk"), to cease the practice of withholding access to newly

electronically filed ("e-filed") civil complaints in the Circuit Court of Cook County (the "Circuit Court") until after administrative processing, including official "acceptance," and requiring that the Clerk provide contemporaneous access to these pleadings upon receipt by the Clerk's Office.

## CNS Publications and Subscribers

4.     I began CNS in 1990 out of a belief that the traditional news media omitted from its coverage much of the important business of the courts, allowing great swaths of legal news to go unreported.  In the years since its founding, CNS has grown steadily and now employs more than 240 people, most of them reporters, across almost all of the 50 states, who cover approximately 2,600 state and federal trial and appellate courts in all 50 states.  CNS employs seven reporters to cover Illinois.

5.     CNS offers a variety of publications.   One category is its "New Litigation Reports," which contain original, staff-written summaries of significant new civil complaints and are delivered to subscribers via e-mail each evening.  New Litigation Reports focus on general jurisdiction complaints against business and government entities, as well as any civil action that might be of interest to CNS's subscribers.  The reports do not cover criminal, juvenile, or family law matters, nor do they include probate filings.  CNS covers the Circuit Court in its *Cook County Report*, which is emailed each evening to 108 subscribers, including law firms with offices in multiple U.S. jurisdictions, and thus is received by thousands of lawyers each day.

6.     To prepare New Litigation Reports, CNS reporters have traditionally visited their assigned courts, either in person or via a court's website, near the end of the day, so they can review all of the complaints filed that day and decide which ones are newsworthy.  Although not all complaints are significant enough to be included in the New Litigation Reports, the reports cover many more complaints than do the daily newspapers.   Given the nature of the New

2

Litigation Reports, any delay in the ability of a reporter to obtain and review newly filed complaints necessarily creates a delay in CNS's ability to inform website readers and subscribers of the factual and legal allegations in newly filed civil litigation.

7.      Among CNS's other publications are what CNS calls "trackers," which allow subscribers to follow developments in an ongoing civil case, and "dingers," which alert subscribers to new civil lawsuits on a particular topic or against a particular party. CNS also publishes two print newsletters, the *Entertainment Law Digest* and the *Four Districts Almanac*, and an electronic *Daily Brief*, which comprehensively covers published appellate rulings, including all published U.S. Supreme Court and federal circuit decisions, as well as significant rulings from all federal district courts, including the three district courts for Illinois.

8.      CNS also publishes a freely-available website featuring news reports and commentary, which is read by hundreds of thousands of readers each month. The website functions much like a daily print newspaper, featuring staff-written articles from throughout the nation that are posted and then rotate off the page in a 24-hour cycle. For example, during the week of October 16-20, 2017, our website featured articles on, among other things, a lawsuit by the Illinois attorney general claiming an organization is tricking elderly veterans into buying insurance products; a Goose Island property owner alleging that People's Gas "secretly" made a deal with the EPA to include his property in a superfund program, costing him millions because the land cannot be sold for development; the District of Columbia and nine states, including Illinois, suing the U.S. Department of Homeland Security for records about the detention and deportation of immigrants, and the unsealing of an indictment in New York in which a top London art dealer was accused of stealing millions of dollars from clients who hired him to help sell their works of art by such artists as Picasso and Chagall.

9. Within the nation's press corps, CNS has been credited as the original source of reporting on a topic by a wide range of publications, including the *ABA Journal*, ABC News, *The Atlantic*, *Austin American-Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, The Daily Beast, *The Christian Science Monitor*, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, NBC News, *New York Daily News*, *New York Magazine*, *The New York Times*, NPR, *The Orange County Register*, Politico, *The Salt Lake City Tribune*, *The Telegraph* (UK), *Rolling Stone*, *San Antonio Express-News*, *Slate*, *The Wall Street Journal*, *The Washington Times*, Women's Health Policy Report, *U.S. News and World Report*, *USA Today*, *The Washington Post*, UPI and others. In addition, U.S., Canadian, and New Zealand radio shows have interviewed CNS reporters.

10. As of the date of this declaration, CNS has more than 2,000 subscribers nationwide. All but a very few of the nation's large and mid-sized law firms subscribe to one or more of our publications. A substantial set of news and entertainment outlets are also CNS subscribers, including but not limited to *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Houston Chronicle*, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal* and Warner Bros., and many TV stations.

11. CNS's news media subscribers rely on CNS to provide them with timely information about civil litigation, our specialty, so they can provide information about those cases to their readers and viewers. In recent years, as the traditional news industry has withered, we have seen an increasing number of news organizations become CNS subscribers. At the

4

same time, we have seen news organizations cut back on court coverage. The end result is that in many courts, CNS effectively serves as a pool reporter, with its reporter sometimes the only journalist reviewing new civil complaints.

12.    Among academic institutions, subscribers to our new litigation reports include Boston College Law School, Boston University, Case Western Reserve University, Harvard Law School, Loyola Law School, MIT Sloan School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law, among others.

## A Tradition of Timely Access To New Civil Complaints

13.    Through my experience as the editor and publisher of CNS for nearly 30 years, including but not limited to my own in-person visits to many state and federal courts, discussions with court officials, and supervising CNS's reporters and editors around the country, I have developed extensive personal knowledge of the procedures that courts throughout the country currently use, and have used in the past, to provide access to new complaints. I have observed a longstanding tradition for both state and federal courts to provide reporters who visit the court every day with timely access to new complaints upon their receipt by the court, irrespective of whether the clerk's office has completed their administrative tasks associated with a new complaint's intake. These intake tasks used to be called docketing but are now often referred to as "processing," and in the e-filing environment often include official "acceptance," although complaints are normally considered filed for statute of limitations and other purposes as of the date and time of their receipt by the clerk's office, even if they are received after the clerk's office closes for the day.

14.    For example, in 1997, I first visited the Everett M. Dirksen United States Courthouse for the Northern District of Illinois. I met with then-Clerk Michael Dobbins, who

took me behind the counter in the filing area and showed me two shallow bins where journalists checked the new complaints and the new rulings. While I was reviewing the new actions, intake clerks would turn around and place just-filed complaints in the complaints bin. Reporters for City News Service, *Chicago Sun-Times* and *Chicago Tribune* worked in the court's press room and checked the new actions and rulings on a daily basis. I then hired a reporter to cover the Northern District of Illinois on a daily basis.

15.     This same basic procedure has been carried forward into the present electronic filing ("e-filing") environment in the Northern District, with e-filing now mandatory. New e-filed complaints can be viewed immediately upon receipt by the court, before any processing is done by court employees, either online via PACER or via public terminals at the courthouse. No matter what time of day or day of the week, new civil complaints filed in the Northern District can be reviewed immediately upon receipt, before any processing by a court employee.

16.     In 1997, I also visited the Richard J. Daley Center, which houses the main courthouse for the Circuit Court. I met with Marie Tabata, assistant to then-Clerk Aurelia Pucinski. Ms. Tabata took me behind the counter into the filing area for the Law Division to show me where reporters reviewed the new complaints. Reporters from *Chicago Tribune*, *Chicago Sun-Times* and *Chicago Daily Law Bulletin* regularly went from the press room into the Law Division and checked the new complaints. We picked up the new complaints from a tray next to intake clerks before they were docketed and reviewed them at an empty desk nearby, staying as late as a supervisor was present. Similarly, I checked new complaints filed in the Chancery Division by reviewing the new cases on the day they were filed, behind the counter, before they were docketed. I then hired a reporter to cover the Circuit Court.

6

17.     The quality and completeness of the access was excellent, with press review encompassing cases filed that day right up until the time the Clerk's Office closed for the day at 4:30 p.m. These procedures, which ensured that journalists who visited the court every day had access to the day's new civil filing, were similar to procedures used by other major state courts. The majority of new complaints continue to be filed in paper form at the Circuit Court, and reporters still review them on the day of receipt, before docketing.

18.     This tradition of timely access to newly filed complaints was similar at state and federal courts I saw, firsthand, across the country. While the access procedures varied somewhat from court to court, their procedures were similar in that they provided reporters with the day's civil complaints regardless of whether clerks had completed docketing or processing. Attached hereto as **Exhibit 1** is a true and correct copy of my declaration (without exhibits) filed on March 14, 2016, in support of CNS's motion for summary judgment in *Courthouse News Service v. Planet*, Case No. 11-cv-08083, Dkt. 124, in the Central District of California, which further describes some of the access procedures I have seen in courts across the nation.

## E-Filing, Access Delays, And Solutions

19.     The tradition of contemporaneous access to newly filed civil complaints is alive and well in the present day, including to paper-filed complaints at the Circuit Court. However, in my capacity as editor of CNS, I have seen a trend in recent years in which a handful of state court clerks have started taking a hard line on press access to new civil actions, refusing to allow journalists to see new complaints contemporaneously with the court's receipt of them. Instead, they take the position that the press have no right to see these newly filed complaints until after administrative processing – which in the e-filing environment often includes, but is not limited to, official "acceptance" by court clerks.

10876448

20. This ousts the press from its traditional lookout point at the initiation of a legal action, where all members of the press once had equal access to the flow of new complaints. As a result, new complaints now move into the public sphere sporadically. Often, by the time the rest of the press can see a new complaint, it is old news. This has harmed CNS's ability to report on new civil lawsuits on a timely basis.

21. In my experience watching courts across the country transition to e-filing, delays that are antithetical to news coverage inevitably result where clerks withhold access while they complete administrative tasks. Press access is then dependent on the work schedules of court employees, and inevitably suffers. Even in the most efficient of clerks' offices, any number of factors can delay processing, including staff numbers, sickness, holidays, vacations, office birthday celebrations and so on. Indeed, I have even seen a St. Patrick's Day parade result in access delays where the court withholds access until after processing.

22. This, for example, is what happened in New York. After years of timely press access to paper-filed complaints at New York Supreme Court, the County Clerk of New York County began withholding e-filed complaints until after processing – justifying that policy on, among other things, the possibility that new e-filed complaint might later be rejected. However, as is true at the Circuit Court, e-filed complaints at New York Supreme were given a "filed" date as of the date of receipt by the New York County Clerk's Office, even if filed while the New York County Clerk's Office was closed. After failing to reach an amicable solution concerning the delayed access to new e-filed complaints, in November 2016, CNS brought a 42 U.S.C. § 1983 action in the Southern District of New York against the New York Clerk captioned *Courthouse News Serv. v. Tingling*, No. 16-cv-08742. In its suit, CNS alleged that the clerk's practice of withholding from public and press review roughly 33% – one out of three – of new

8

complaints until after processing, which resulted in delays in access for at least one court day, was unconstitutional.

23.     On December 16, 2016, the court held a hearing on CNS's motion for a preliminary injunction. A true and correct copy of the transcript of that hearing is attached as **Exhibit 2**. At the conclusion of the hearing, Judge Edgardo Ramos granted CNS's motion, holding that "the clerk may not prevent the press from accessing newly filed documents because of its review and logging procedures." Hearing Trans., at 19. The New York County Clerk complied with the injunction in January 2017 by making new complaints that are e-filed available through the New York State Courts Electronic Filing ("NYSCEF") website immediately after the complaints are submitted by the party and before any clerk review, other administrative processing, or assignment of an index number, a procedure further documented in the Consent Order entered in that case on September 29, 2017, a true and correct copy of which is attached hereto as **Exhibit 3**. This solution for providing prompt access in an e-filing environment – what I think of as an electronic in-box akin to the traditional wood or wire boxes in the intake area where the press traditionally reviewed paper complains on their receipt and before administrative processing – was up and running within six weeks of the injunction being issued, and CNS is now seeing civil complaints as soon as they are received for filing.

24.     Following the New York County Clerk's lead, as of the date of this declaration, clerks in the remaining twenty-six New York e-filing counties – including Albany, Broome, Chautauqua, Cortland, Dutchess, Erie, Essex, Livingston, Monroe, Nassau, Niagara, Oneida, Onondaga, Ontario, Orange, Oswego, Putnam, Rockland, Suffolk, Tompkins, Westchester, and all five New York City Counties – now make newly filed civil complaints accessible to the press and public through the NYSCEF website immediately after the complaints are e-filed, prior to

9

10876448

any clerk examination of the document or assignment of an index number. This access system is described in a "Notice to the Bar" accessible on the NYSCEF home page at http://www.nycourts.gov/rules/efiling/ny-county.shtml. A true and correct copy of the Notice to the Bar, printed from the NYSCEF home page on October 11, 2017, is attached hereto as **Exhibit 4**.

25.     Users of the NYSCEF website can now search for cases e-filed on a selected date, and the results will include any documents filed in that case, including complaints that have not yet been reviewed or otherwise administratively processed by the court.     This includes complaints e-filed after the clerk's office has closed for the day or on weekends (in New York, new complaints and other documents e-filed at night or on weekends are given a "filed" date as of the date of receipt, no matter what the time of day or day of week).     These cases are listed with a notation "Not Assigned" in place of a case number, as shown:

| To view a case, click on the link | eFiling Status | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Case # Received Date | Case Status | Caption | | | | | | Court Case Type | Add Filings |
| Not Assigned 10/11/2017 | Waiting for Index Number Pre-RJI | Worldwide Capital Management Inc. - v. - Alliance Wire & Steel, Inc. et al | | | | | | Ontario County Supreme Court Other Matters - Contract Non-Commercial | |
| Not Assigned 10/11/2017 | Waiting for Index Number Pre-RJI | WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR OPTION ONE MORTGAGE LOAN TRUST 2005-2, ASSET-BACKED CERTIFICATES, SERIES 2005-2 - v. - CRAIG S. CARRIER et al | | | | | | Ontario County Supreme Court Real Property - Mortgage Foreclosure - Residential | |
| Not Assigned 10/11/2017 | Waiting for Index Number Pre-RJI | TVT Capital, LLC - v. - USA Publishers, Inc et al | | | | | | Ontario County Supreme Court Other Matters - Contract Non-Commercial | |

Attached as **Exhibit 5** is a true and correct copy of a screen capture showing, respectively, the "New Cases" search screen and a page of search results generated on October 11, 2017.

26.     A "Not Assigned" link in a search results page leads to a case information screen

that includes a link to a complaint, which can be viewed and downloaded without any charge:

| Doc # | To view details, click on the Doc # link<br>Document Type<br>Information | Status | Received Date<br>Filing User | View |
|---|---|---|---|---|
| 1 | SUMMONS + COMPLAINT<br>summons and complaint | Pending | 10/11/2017<br>Sposato, M. | Confirmation Notice |
| 2 | NOTICE OF PENDENCY<br>NOTICE OF PENDENCY | Pending | 10/11/2017<br>Sposato, M. | Confirmation Notice |

27.     Attached as **Exhibit 6** is a true and correct copy of a screen capture of a case

information screen for a complaint e-filed on October 11, 2017, that had not been processed

when the screen capture was taken.

28.     Complaints that have not yet been reviewed usually include a header that reads:

"CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY

CLERK," and a footer that reads:

> This is a copy of a pleading filed electronically pursuant to the New York State
> court rules (22 NYCRR §202.5-b(d)(3)(i)), which, at the time of its printout from
> the court's electronic website, had not yet been reviewed and approved by the
> County Clerk in the county of filing. Because court rules (22 NYCRR §202.5[d])
> authorize the County Clerk to reject filings and attempted filings for various
> reasons, readers should be aware that documents bearing this legend may not have
> been accepted for filing by the County Clerk.

Attached as **Exhibit 7** is a true and correct copy of the header and footer from a complaint as it

appeared on October 11, 2017, before processing by the court.

29.     Other state courts that provide similar electronic in-box access to newly e-filed

civil complaints upon receipt, before clerk review or processing, include five courts in Georgia

(the State Court of Fulton County, the Superior Court of Fulton County, the State Court of

DeKalb County, the Superior Court of DeKalb County, and the State Court of Cobb County),

Hartford County Superior Court in Connecticut, Jefferson County Circuit Court in Alabama, Salt

Lake County Court (Third Judicial District) in Utah, and the Eighth Judicial District Court in

Nevada. Some provide an electronic in-box online, others through terminals at the courthouse, and sometimes both. In some courts, new e-filed actions are automatically assigned a permanent case number, while in others, complaints bear transaction numbers only when they first appear in the electronic in-box and receive a permanent case number only after administrative tasks are completed. Some jurisdictions limit access to this electronic in-box to credentialed press, but it can be provided to any interested member of the public at large. In all instances, the method used provides consistently timely access to new civil complaints as soon as they are filed, upon receipt, before they are processed.

30. In addition, virtually every federal district court provides timely access to new civil complaints upon receipt through some variation of an electronic in-box, before clerk review or processing. Within these courts, there are three main variations.

31. The largest group of federal courts, which includes the Northern District of Illinois, provide access by automatically assigning a permanent case number upon receipt of a new civil action and immediately providing access to all new civil complaints, at any time of day or night, on weekdays or on weekends.

32. Other federal courts automatically assign a temporary number and allow review of the new complaints with those temporary numbers upon receipt, at any time of day or night. Still other federal courts send new cases into an electronic queue with only a generic, "MC" shell case number, which serve as a temporary placeholder for the new case, before a permanent case number is assigned, and those cases too can be reviewed by the press upon receipt.

33. The minority of federal courts that do not use the electronic in-box method nevertheless have found ways to provide timely access to e-filed complaints, even before processing. For example, the Northern District of Alabama prints out complaints upon electronic

12

receipt and, before processing, puts them in the same old-fashioned, wooden press box that copies of paper-filed complaints are placed in press review.

**Harm Caused By Withholding Access**

34.    A new civil complaint serves as the opening bell in a legal contest. The Circuit Court Clerk's policy and practice of withholding complaints until after administrative processing means CNS cannot inform its subscribers and the public of who has been hailed into the courts or why, because the action is hidden from view. A delay of even one day means that news is delayed by a full news cycle. When there is an intervening weekend or holiday, or both, the delay extends out to three or four days. The delays are worse for those complaints filed late in the day, which tend to be the actions that are the most important and newsworthy.

35.    The Clerk's withholding policy causes CNS subscribers to question why we are reporting on stale events, thus damaging the worth of our publications, or why CNS has not reported on new litigations leaked to one press outlet. The policy has a series of additional negative effects on both the news and the judicial system. When court officials keep the new complaints from the press, that vacuum of information gives a plaintiff the power to manipulate and control news on the start of litigation. The plaintiff is able to feed the news to a friendly publication and ensure prominent and favorable coverage. When a single news outlet is the only media reporting on a complaint, the public is deprived of competing coverage and impartial viewpoints.

36.    Even in situations where CNS and other media are not scooped as a result of delays in access caused by the Clerk's practice of not allowing access until after processing, that practice delays news coverage of new civil actions filed at the Circuit Court.    The newsworthiness of a new civil action declines with time. In my almost 30 years at the helm of

13

10876448

CNS, I have seen time and time again that civil actions not reported on the day of filing are either not covered at all or receive less prominent coverage, and are thus less likely to come to the public's attention. The power of news and its ability to spark public discussion is greatest in its immediacy. The passage of time draws away the vibrancy and relevance of news as other events overtake it and occupy the public's interest, while the old news marches steadily into the shade of the past and ultimately into the realm of history.

37. This is especially true in today's digital age, where news is transmitted immediately through stories published online, accompanied by alerts sent through email, text messages and social media. In an earlier era, the race to the phone by wire services was legendary. If United Press International beat the Associated Press by twenty minutes, that was a major victory, a story to tell for months afterwards. Today, all big publications compete like the wire services used to, racing to upload their stories to their editors and from them onto the newspaper's website, with the most important stories relayed within minutes as alerts. For daily publications, whether it is the *Los Angeles Times*, *The Washington Post*, *The New York Times*, or the many other publications that have survived, including CNS, speed is critical. Modern times have shortened the news cycle and correspondingly reduced the shelf life of a news story, with delay effectively undercutting if not demolishing the ability of a news story to garner public discussion.

38. The Circuit Court is an important court for news, and withholding access also leads to inaccuracy in news reporting. Where access to the complaint is withheld, news about the new action often gets out through press releases or leaks, but it is prone to inaccuracies because the actual complaint setting forth the facts alleged and causes of action, cannot be reviewed through the Clerk's Office. The public then receives information about the courts that

14

10876448

is far inferior to a full, timely, and accurate description of the factual and legal allegations contained in the complaint itself.

39.    While not all new civil cases contain news for the broad public, they are often of great importance to individual parties and their lawyers, as well as to other businesses, communities, and individuals who may be affected by the lawsuit. Delay of the kind that exists at the Circuit Court is contrary to basic principles of open government and contrary to the interest of the public in knowing that a legal battle at the Circuit Court has begun and who and what that battle is about. It is contrary to the First Amendment right of the public to discuss the business of the courts in an informed and contemporaneous manner.

### CNS's Efforts to Resolve Circuit Court Access Problems

40.    In an effort to amicably resolve the delays in access to newly e-filed complaints in the Circuit Court, at my direction, CNS's representative Demetrius Carney wrote to Kelly Smeltzer, General Counsel of the Clerk's Office, on February 27, 2017, to alert her to the delays in access caused by the Clerk's practice of withholding e-filed complaints until after administrative processing, and to request that the media be provided access to complaints upon receipt, irrespective of whether processing had been completed. A true and correct copy of Mr. Carney's Feb. 27 email and attachments are attached hereto as **Exhibit 8**. I would note that Mr. Carney was an attorney at Bryan Cave LLP until February 2017, when he retired from Bryan Cave LLP and opened a consulting practice. As CNS explained in the attachments to the February 27 email to Ms. Smeltzer, other courts, including the courts I have noted above, were then (and still are) providing access to newly e-filed complaints upon receipt by the clerk's office and prior to administrative review, assignment of a case number, or formal "acceptance." The

10876448

attachments also explained such access need not be provided via the Internet, but could be provided through computer terminals at the courthouse itself.

41.     On March 15, 2017, also at my direction, Mr. Carney met with the Clerk's First Deputy General Counsel, Melissa Ford, who I understand to be the point person on all legal issues relating to e-filing in the Clerk's Office. It is my understanding that during that meeting, Ms. Ford stated that the Clerk's Office could not accommodate CNS's request for contemporaneous access to e-filed complaints upon receipt and before processing for the reason that § 4.30 of the Electronic Access Policy for Circuit Court Records of Illinois ("Electronic Access Policy") prohibits the Clerk from providing electronic access to complaints over the Internet.

42.     As CNS had pointed out in its February 27 correspondence, however, access upon receipt and before processing does not require that access be provided online. To make sure this point was clear, by email dated April 20, Mr. Carney provided Ms. Ford with additional documents reiterating that the access CNS sought could be provided locally via computer terminals at the courthouse, and need not be provided online. A true and correct copy of the April 20 email and attachments Mr. Carney sent to Ms. Ford are attached hereto as **Exhibit 9**.

43.     By email dated April 21, Ms. Ford acknowledged receipt of Mr. Carney's email and stated that she would get back to him the following week after she had an opportunity to review the attachments he had provided, but CNS never received a substantive response. Accordingly, on May 8, 2017, again at my direction, Mr. Carney met with Rick Abrams, Chief Financial Officer for the Clerk's Office. Following that meeting, Ms. Smeltzer sent Mr. Carney an email letting him know she would be providing a written response to CNS's request.

16

10876448

44.     After having not received the promised response from the Clerk's Office, on June 15, 2017, at my direction, CNS's counsel, Brian Sher of Bryan Cave LLP, wrote to Ms. Smeltzer summarizing the applicable law and again requesting a response to CNS's request that the Clerk's Office stop withholding new e-filed complaints until after processing. A true and correct copy of Mr. Sher's June 15 letter is attached hereto as **Exhibit 10**.

45.     By letter dated June 23, Ms. Smeltzer informed CNS that: (1) the Clerk's Office was declining CNS's request; (2) the Clerk would continue withholding access to e-filed complaints until after administrative processing, including official "acceptance," and (3) the Clerks' Office "plan[ned] to continue this practice when eFiling becomes mandatory" on January 1, 2018. A true and correct copy of Ms. Smeltzer's June 23 letter is attached as **Exhibit 11**. Ms. Smeltzer's letter did not mention the Electronic Access Policy. Instead, it cited two other sets of rules – the Illinois Supreme Court's Electronic Standards and Principles ("Standards and Principles"), as amended September 16, 2014, and Circuit Court General Administrative Order 2014-02 ("GAO 2014-02") – and stated that providing access upon receipt and before administrative processing would mean "the press would essentially be given access to cases that may be rejected by the Clerk's Office" and that "would not be considered officially filed." This, Ms. Smeltzer wrote, "could create mass confusion for the public, if the press reports on a case that may never actually be resubmitted for filing; leading to false reporting and potential liability for the court and the press."

46.     As CNS explains in its memorandum of law supporting its motion for a preliminary injunction, contrary to Ms. Smeltzer's June 23 letter, the Standards and Principles and GAO 2014-02, true and correct copies of which are attached as **Exhibit 12**, do ***not*** support the Clerk's policy and practice of withholding new e-filed complaints. I would also note that as

17

10876448

to the specter of "mass confusion" if a complaint is rejected, that old ghost has been around for a long time and never caused anybody any harm or confusion. In my almost 30 years at the helm of CNS, it has been my experience that paper filings seen by reporters at their traditional lookout at intake were on occasion rejected after coming across the counter and after reporters had already seen them. Most often, the filer's check had bounced, but there can be other reasons based on local rules. At the Circuit Court, this has been occurring since I first visited the court in 1997 and without doubt for decades before then, for as long as checks have been in use. Further, I am unaware of a single instance where reporting on a rejected complaint resulted in any liability for a court or the press in any court in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Pasadena, California on this 8ᵗʰ day of November 2017.

William Girdner

10876448