# **EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                                  Plaintiff,<br><br>                                 v.<br><br>DOROTHY BROWN, in her official capacity as the Clerk of the Circuit Court of Cook County, Illinois,<br><br>                                  Defendant. | Case No: 17-cv-7933<br><br>Honorable Matthew F. Kennelly |

**DECLARATION OF ADAM ANGIONE IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Adam Angione, declare and state as follows:

      1.      I serve as Midwest and Northeast Bureau Chief for Courthouse News Service ("CNS"), the plaintiff in the above-captioned action.  I make this declaration in support of CNS's motion for a preliminary injunction, directing Defendant Dorothy Brown, sued in her official capacity as Clerk of the Circuit Court of Cook County, Illinois ("Clerk"), to cease the practice of withholding access to newly electronically filed ("e-filed") civil complaints in the Circuit Court of Cook County until after administrative processing, including official "acceptance," and requiring that the Clerk provide contemporaneous access to these pleadings upon receipt by the Clerk's Office.

      2.      I have personal knowledge of the following facts, except where otherwise expressly stated to the contrary, and could and would competently testify to them if called as a witness.

**My Role at CNS**

      3.      I was hired as a reporter by CNS in 2004 to cover a number of federal and state courts in Ohio.  In 2006, I was promoted to the position of Special Projects Editor, and in 2007, I was

10875594

named the Midwest and Northeast Bureau Chief, which includes supervising approximately thirty-five CNS reporters covering both state and federal courts in the Northeast and Midwest regions of the United States. My role also includes monitoring various courts across the country as they transition from paper-based courts to electronic courts – whether the transition involves a move to electronic filing ("e-filing"), an electronic case management system, or both.

4. As these transitions take place, particularly in those courts in the Midwest and Northeast regions of the United States, I am responsible for working with court officials to ensure that the transition to e-filing or an electronic case management system does not result in an erosion of contemporaneous access to new complaints. In this role, I have gained extensive knowledge regarding various systems that support e-filing, electronic case management systems, and electronic public access to court records. I also work with court officials in state and federal courts to come up with solutions to return timely access where it has declined, something that, in my experience, often follows a court's adoption of an e-filing or electronic case management system.

5. As a bureau chief, I personally visit many of the courts I supervise for purposes of training reporters and staying up to date on access procedures. I have therefore observed and experienced the procedures used by CNS's reporters to access and review new civil complaints, both paper-filed and e-filed, in courts throughout the country, including the Circuit Court of Cook County in Chicago, Illinois (the "Circuit Court").

**Access To Civil Complaints At The Circuit Court**

6. I have been responsible for overseeing coverage of the Circuit Court since 2008, and have visited it numerous times over the past nine years, at times covering the court myself when the regular CNS reporter has been on vacation or otherwise unavailable. In July 2014, for instance, I spent five days covering the Circuit Court myself and another five days training CNS's then-new and

now current Circuit Court reporter, Lisa Klein, who visits the courthouse on a daily basis to review the newly filed civil actions.

7.During her daily visits to the Circuit Court, Ms. Klein is responsible for reviewing the entire flow of new civil complaints filed in the Law and Chancery Divisions, and for preparing summaries of the newsworthy complaints for inclusion in the *Cook County Report*, one of CNS's "New Litigation Reports," which is emailed to CNS's subscribers nightly. A true and correct copy of a recent *Cook County Report* is attached hereto as **Exhibit 1**. Ms. Klein also contributes news stories about new civil complaints and other legal happenings in and around Chicago to CNS's website, www.courthousenews.com. Ms. Klein is required to visit the Circuit Court every day the court is open to the public in order to report on new civil actions received by that court.

8.Based on my continued direct supervision of Ms. Klein, including my most recent two-day visit in September 2017, while the procedures I observed for reviewing new complaints filed over the counter at the courthouse remain identical to what they were in July 2014, the procedures for reviewing new e-filed complaints have changed, as described below.

9.During my visit to the Circuit Court in July 2014, and again in September 2017, I went through the following procedures to review the new civil complaints that had been received for filing on the day of my visit. Upon arriving at the Circuit Court's main courthouse, the Richard J. Daley Center, which is located at 50 West Washington Street in downtown Chicago, Ms. Klein and I passed through security and then proceeded to the 7th floor of the building where the press room is located. Each media outlet that regularly covers the Circuit Court, including CNS, has its own key for this room. There are currently nine reporters in the press room from various media outlets that cover the Circuit Court, including Bloomberg, Reuters, Law360, the *Chicago Daily Law Bulletin*, the *Chicago Sun Times,* and the *Chicago Tribune.* The in-house press reporters are permitted to stay

in the press room even after the courthouse closes to the public at 6:00 p.m., and when the last reporter leaves the press room for the night, that reporter shuts and locks the door.

10. In order to review new complaints filed in paper form, reporters in the press room take turns at various times throughout the day retrieving new complaints from the Law and Chancery Divisions' intake desks, which are located one floor up from the press room, on the 8th floor. As I have personally observed, all new paper-filed complaints are accompanied by a press copy. In the Chancery Division, the press copies are placed in a black plastic bin or metal wire tray just behind the counter, at the window of the specific intake clerk who received the complaint. Members of the press are then permitted to retrieve the press copies by reaching over the counter to each basket where the new paper-filed complaints are placed upon intake.

11. In the Law Division, press copies of new complaints are similarly placed into black plastic bins behind the counter at each intake clerk's window, but in the Law Division the press is invited to go behind the counter to gather the complaints. As I was able to do myself during my recent visit in September 2017, reporters are also permitted to check for new civil complaints in several other areas behind the counter in the Law Division, each location representing a different step in the intake and docketing process. Paper-filed complaints typically have a file-stamp that displays the case number and date and time of filing, which is imprinted onto the complaints as they cross the counter, but they are otherwise unprocessed, as evidenced by the fact they are not in folders and the information about the new complaints is not available on the court's online docket website until at least one day later.

12. After locating all of the new civil complaints, the reporter then brings those complaints to the press room, where all of the reporters take turns reviewing them. When all of the reporters are done reviewing the new complaints, they are placed in a wire basket just inside the door

- 5 -

of the press room. The following day, the new complaints that were left in the basket are returned to the Clerk's Office by one of the press room reporters, typically by noon.

13. Prior to January 2015, new e-filed complaints were printed out by the Clerk's Office, and reporters would simply retrieve and review those complaints prior to processing, together with the paper-filed complaints as described above. As Ms. Klein's direct supervisor, I became aware that in January 2015, the Clerk's Office stopped printing new e-filed complaints for the press, and instead began requiring reporters to wait to review the new e-filed complaints until after they had undergone administrative processing, including official "acceptance," and were posted for electronic viewing on the Clerk-provided computer terminal located in the press room. At the time, the volume of e-filing was low but it has steadily grown since then.

14. Because e-filed complaints are withheld from press review during administrative processing, the press frequently cannot see them until at least the following business day and often times longer. When there is an intervening weekend and/or holiday, delays of even one business day can add up to three or four calendar days.

15. The press never has access to complaints e-filed after the Clerk's Office closes at 4:30 p.m., even though complaints received before midnight on a court day are given that day's "filed" date for statute of limitations purposes and other deadlines. In fact, the filing party receives a notice from the Clerk's Office after the complaint is "accepted," which includes the date and time of filing as well as the date and time of acceptance.

16. In contrast, because the Circuit Court does not condition press review of paper-filed complaints on administrative processing, CNS is able to review and report on paper filings immediately upon receipt and placement into the press copy bin at each counter clerk's window.

17. Based on Circuit Court General Administrative Order No. 2014-02, effective June 13, 2016, a true and correct copy of which is attached hereto as **Exhibit 2**, as well as my own observations, my understanding is that the Circuit Court permits, but does not require, e-filing of documents, including the e-filing of new complaints, in cases or proceedings to be heard in the following divisions: (i) Chancery Division; (ii) Law Division; (iii) civil cases in the Municipal Department; (iv) Domestic Relations/Child Support Division; (v) Probate Division; and (vi) certain types of cases in its Elder Law & Miscellaneous Remedies Division. However, the permissive nature of e-filing in the Circuit Court is changing: by order of the Illinois Supreme Court, e-filing is scheduled to become mandatory at the Circuit Court on January 1, 2018. *See* ILL. S. CT., M.R. 18368 (eff. Jan. 22, 2016), a true and correct copy of which is attached hereto as **Exhibit 3**.

18. It has been my experience that when a court switches to mandatory e-filing, delays in access that emerged while e-filing was permissive never get better and normally get worse as the administrative processing required to keep up with the increased volume of e-filed cases becomes even more time consuming.

**Substantial Delays Under Post-Processing Access**

19. CNS collected access data for all of the newly filed civil complaints that it reviewed from June 1, 2017, through September 30, 2017 (the "Access Statistics"), including complaints filed in both paper and electronic form, and in both the Law and Chancery Divisions. The details for those statistics are attached hereto as **Exhibit 4**. During this four-month period, CNS reviewed 5,533 new complaints. Nearly half of those – 2,414 complaints – were filed electronically. On average, about 40% – two out of every five – of the e-filed complaints were withheld from the public and press for at least one court day, with actual delays reaching, in one instance, as many as twenty-eight days. Specifically, during this four-month period, 601 e-filed complaints were not available

until the next court day after filing, and an additional 352 e-filed complaints were not available for two or more days after filing.

20. Multiple-day delays were not limited to situations with intervening weekends or holidays. Of the seventy-five complaints that were e-filed during the three-day period between Tuesday, August 29 and Thursday, August 31, *none* could be seen by the press on the day of filing. And while the thirty-two complaints that were e-filed on Thursday, August 31 were all made available the very next day, the forty-three complaints e-filed on Tuesday, August 29 and Wednesday, August 30 were all withheld for two to three court days.

21. These delays are continuing, and are preventing CNS – and by extension its subscribers and other readers – from obtaining timely information about important new civil actions. For example, on October 6, 2017, a suit captioned as *John Loos v. Major League Baseball and Chicago Cubs Baseball Club,* Case No. 2017-L-010195, was e-filed in the Circuit Court stemming from injuries a fan suffered at Wrigley Field as the result of being struck in the face by a foul ball. However, the complaint was not made available by the Clerk's Office until October 13, 2017, a full week after it was filed. The *Chicago Tribune* apparently received a copy of this complaint from plaintiff's counsel, as it ran a story on the complaint on October 9, 2017, well ahead of when CNS could see the complaint or was even aware of its filing. A copy of the Oct. 9, 2017 *Chicago Tribune* Article is attached hereto as **Exhibit 5**.

22. Even in situations where CNS is not scooped as a result of the delays in access caused by the Clerk's policy and practice of not allowing access to e-filed complaints until after administrative processing and official "acceptance," delays hurt news coverage of new civil actions filed in the Circuit Court. And as is true in most courts where e-filing is permissive, e-filed complaints tend to be the most newsworthy.

- 7 -

10875594

- 8 -

23. For instance, the owner of a 2014 Ford Focus recently sued Ford Motor Company alleging that her car's PowerShift transmission was defective in a suit captioned as *Helen E. Parker v. Ford Motor Company* and assigned Case No. 2017-L-10312. The PowerShift transmission has been a significant issue for Ford Motor Company in recent years, and it has found itself having to defend against a recently filed class action suit brought on behalf of nearly 7,000 Ford Fiesta and Focus owners over the issue, resulting in the car company extending its powertrain warranty for certain car classes from five years/60,000 miles to seven years/100,000 miles to help cover the problems as part of the class-action settlement. Notwithstanding the newsworthiness of this new action, and although the complaint was e-filed in the Circuit Court on October 11, 2017, at 2:46 p.m., the complaint was withheld from press review by the Clerk's Office until the next day.

24. Also on October 11, 2017, a class action suit for mandamus, captioned as *John Mengel v. Maria Pappas* and assigned Case No. 2017-CH-13657, was electronically filed in the Circuit Court. In the complaint, the plaintiff representative seeks an order from the court directing the Cook County Treasurer, Maria Pappas, to pay refunds allegedly due to homeowners for overpayments on property taxes that were made on purportedly improper assessments of land values, before the values were later corrected. Despite the complaint having been received by the Clerk's Office at 3:42 p.m., it was not released for press review until the following day.

25. A few additional examples of some of the newsworthy new complaints that were e-filed and withheld because of the Clerk's policy and practice are:

- Twenty-two individual cases filed against McCormick & Co., Kraft Foods and several other companies that produce or distribute food additives because their employees allegedly sustained respiratory injuries after working with harmful flavoring chemicals for years at a time – all twenty-two suits were filed on September 13, 2017, yet while two were made available the following day, on September 14, the remaining twenty were withheld for an additional five days, not being released until September 19;

- The National Writers Union and dozens of freelancers filed a class action alleging that Ebony Magazine and Jet Magazine had not paid them for their work – filed on September 5, 2017, yet access denied until the following day, September 6;

- A former teacher at Ogden International School sued the Chicago Board of Education claiming that another teacher had a history of lewd conduct and allegedly secretly filmed her using the toilet – filed September 7, 2017, but not made available until September 8;

- A patient sued a plastic surgery practice contending that it published before and after photos of the patient's breast augmentation without her permission – filed September 7, 2017, but press review denied for five days, until September 12;

- Another suit against the Chicago Board of Education alleging that it cut the hours and pay of an employee who cooperated with an internal investigation into financial waste, mismanagement and fraud by a co-worker – filed September 13, 2017, yet not made available until six days later, on September 19; and

- The City of Evanston sued the Village of Skokie stemming from a dispute about how much Skokie should pay Evanston to supply its potable water – filed September 26, 2017, but press review denied until the following day, on September 27.

**Federal District Courts In Illinois Provide Access Before Processing**

26. The vast majority of federal district courts, including this District and the other two district courts in Illinois, provide access to newly filed complaints contemporaneously with their filing, without clerk processing, 24 hours a day, seven days a week. The result is that reporters have access to complaints filed in all three federal district courts in Illinois upon the courts' receipt of the complaints, on par with the pre-processing access available to the press during the paper-filing era in most federal courts.

Northern District of Illinois

27. CNS began covering the Eastern Division of the United States District Court for the Northern District of Illinois (the "Northern District") in the early 2000s, and its current reporter for this court, Antonie Young, has covered the court on a continuous basis since 2008, when she was promoted from a part-time substitute reporter to a full-time reporter. During this entire time, I have

- 9 -

been Ms. Young's direct supervisor. Ms. Young is responsible for reporting on newsworthy civil complaints filed here in the Northern District, and summarizing those complaints in the *Chicago Federal Report*, another one of CNS's New Litigation Reports, which is emailed to subscribers nightly. A true and correct copy of a recent *Chicago Federal Report* is attached hereto as **Exhibit 6**. In supervising CNS's coverage of the Northern District, I have covered this court myself many times over the years.

28. Since 2005, this district has required the electronic filing of almost all court documents, including case-initiating pleadings. As such, Ms. Young has always covered the court online and remotely using CNS's subscription to access the court's Public Access to Court Electronic Records ("PACER") website. The same access is available free of charge through any of the eight public access terminals located at the Everett McKinley Dirksen United States Courthouse, the home of the Northern District's Eastern Division.

29. When Ms. Young first started covering the Northern District in 2008, all new complaints were filed into a single "MC" shell case number, which served as a temporary placeholder for the new case before it was reviewed and assigned a permanent case number by the clerk's staff. Since every new complaint was filed under the same temporary shell case number, each individual case appeared as a separate docket entry on the shell case number's register of actions. While covering this court several times for Ms. Young as a substitute, I reviewed the new complaints by first conducting a "Query" search using the shell case number, and then narrowing the docket entries to the date range that I wanted to search. When results were returned, all of the complaints were listed from oldest to newest, together with links to the complaints themselves. Most of the complaints did not have a permanent case number yet, and my understanding was that the complaints were pushed onto PACER under this shell case number as soon as they were

submitted by the filer, and before any court employee had taken any action to process the new complaint. These procedures provided CNS with access to 100% of new civil complaints on the same day they were electronically received by the court for filing, even if the complaints had not yet been reviewed by a clerk or assigned a permanent case number.

30. In July 2009, the court updated its CM/ECF (which stands for "Case Management/Electronic Case Filing") system so that a permanent case number is automatically assigned to each new case as it is filed, even before the complaint is reviewed and processed by the clerk's staff. Therefore, the procedures that Ms. Young currently uses to access and review new civil complaints have changed slightly, in that she now runs a "Civil Case Report" search on the court's PACER website, which she can either do for no charge through public access computer terminals located at the courthouse, or remotely online for a per-page fee.

31. I ran such searches numerous times over the last several years on the Northern District's PACER website. By checking PACER after the court was closed for the day and on weekends, I have observed that new civil complaints flow automatically onto the Northern District's PACER website at the moment they are e-filed, and without any clerk intervention. Because the deadline for the *Chicago Federal Report* is published in the early evening, the few cases filed into the Northern District late in the evening or on weekends, while accessible, are not reported in the *Chicago Federal Report* until the following day. But Ms. Young is nevertheless able to review all of the new civil complaints on the day they are received by the court for filing.

Central District of Illinois

32. I have been the bureau chief for United States District Court for the Central District of Illinois (the "Central District") since June 2014. The reporter responsible for covering this court is Karen Martin. Ms. Martin, who has covered the Central District since 2003, is responsible for

- 11 -

reviewing all the new civil complaints filed in this court, and then summarizing those newsworthy new civil filings for inclusion in the *Illinois Report*, another one of CNS's New Litigation Reports, which is emailed nightly to subscribers. A true and correct copy of a recent *Illinois Report* is attached hereto as **Exhibit 7**.

33. E-filing in the Central District is voluntary, though I have been told by staff in the clerk's office that virtually all new complaints are e-filed. Therefore, Ms. Martin covers the court remotely using a CNS PACER account. However, the same access is available free of charge through public access computer terminals at the Springfield Division of the court. My observation, by checking the court's PACER website after hours, is that new e-filed complaints are pushed directly to PACER with no clerk processing, acceptance, or other intervention, given that new complaints continue to appear on PACER even long after the court has closed for the day. Through these procedures, CNS is able to access and review all new e-filed complaints on the same day they are received by the court for filing.

Southern District of Illinois

34. Ms. Martin also covers the United States District Court for the Southern District of Illinois (the "Southern District"), a court that I have supervised as bureau chief since June 2014. Ms. Martin, who has also covered this court for the last fourteen years, is responsible for reviewing all new civil complaints received for filing in the Southern District, and then summarizing those newsworthy new actions for the *Illinois Report*, which, as noted above, is emailed to subscribers nightly. Electronic filing is mandatory at this court.

35. As with the Central District, Ms. Martin covers the Southern District remotely using a CNS PACER account. My understanding is that there are public access computer terminals available at the Benton Division of the Southern District that provide the same access free of charge.

- 12 -

10875594

In either case, Ms. Martin searches for new civil complaints on the court's PACER website. In conducting my own such search on the court's PACER website, my observation is that new complaints are pushed directly to PACER with no clerk processing, acceptance, or other intervention, given that new complaints continue to flow online even long after the court had closed for the day and on weekends. As such, Ms. Martin is able to access and review all new civil complaints on the same day they are received by the court for filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in New York City, New York on this __8__ day of November, 2017.

_____
Adam Angione